In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 11-2265

LINDA BRUMFIELD,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 4960 — **Harry D. Leinenweber**, *Judge.*

---

No. 11-3836

LINDA BRUMFIELD,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 C 5371 — **Matthew F. Kennelly**, *Judge*.

ARGUED SEPTEMBER 18, 2012 — DECIDED NOVEMBER 6, 2013

Before FLAUM, SYKES, and TINDER, *Circuit Judges*.

SYKES, *Circuit Judge*. These consolidated appeals raise a question of first impression in this circuit: Does Title II of the Americans with Disabilities Act ("ADA") cover employment-related disability discrimination? Title II provides that state and local governments may not exclude eligible disabled persons from "participation in" or "the benefits of" governmental "services, programs, or activities" or otherwise "subject[]" an eligible disabled person "to discrimination." *See* 42 U.S.C. § 12132. Title I, in contrast, specifically prohibits *employment* discrimination on the basis of disability. *See id.* § 12112(a).

The circuits are split on whether Title II applies to disability discrimination in public employment, supplementing the remedy in Title I. Two circuits have squarely held that it does not apply in this context, leaving Title I as the exclusive ADA remedy for claims of disability discrimination in both public and private employment. *See Elwell v. Okla. ex rel. Bd. of Regents of the Univ. of Okla.*, 693 F.3d 1303 (10th Cir. 2012); *Zimmerman v. Or. Dep't. of Justice*, 170 F.3d 1169 (9th Cir. 1999).

One circuit has reached the opposite conclusion. *See Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816 (11th Cir. 1998).

The issue arises here in a flurry of lawsuits brought by Linda Brumfield, who was a Chicago police officer from 1999 until she was fired in 2010. She alleges that in 2006 she began to experience unspecified "psychological problems" and the City required her to submit to periodic psychological evaluations to determine whether she was capable of performing her job. Each time she was found fit for duty. In the meantime, however, the Chicago Police Board suspended her three times and fired her in 2010.

Brumfield sued the City of Chicago for employment discrimination, splitting her claims across three lawsuits; only the second and third are relevant here. The second suit alleged claims under Title II of the ADA and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and the third suit alleged a claim under Title I of the ADA. The district court held that Title II applied in this context but dismissed the second suit for failure to state a claim under either Title II *or* the Rehabilitation Act. A different district judge dismissed the Title I claim in the third suit as barred by res judicata.

We affirm, though on somewhat different reasoning. We join the Ninth and Tenth Circuits and hold that Title II of the ADA does not cover disability discrimination in public employment; this kind of claim must be brought under Title I. The Rehabilitation Act claim fails because Brumfield has not alleged that she was suspended or fired by reason of disability. Finally, Brumfield does not argue that the district court's res

judicata ruling was mistaken but, rather, skips right to the merits of her Title I claim. She has thus waived any challenge to the dismissal of the Title I claim on preclusion grounds.

## I. Background

We take the following facts from Brumfield's complaints, accept them as true, and draw reasonable inferences in her favor. *See McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012). In 1999 the City of Chicago hired Brumfield as a full-time, nonprobationary police officer. In 2006 she began to experience unspecified "psychological problems" that interfered with her ability to sleep, eat, and concentrate. The City became aware of these difficulties and required her to submit to psychological examinations on four separate occasions between June 2006 and August 2007. Each time Brumfield was found capable of continuing her work as a police officer, though the examiners informed the City that she was vulnerable to workplace stress.

In April 2008 Brumfield filed a complaint in federal district court in Northern Illinois alleging that subjecting her to psychological examinations amounted to discrimination on account of race, sex, and sexual orientation in violation of federal and state antidiscrimination laws. The case was assigned to Judge Harry Leinenweber. In August 2008 while the case was still pending, the City suspended Brumfield without pay pending discharge proceedings before the Chicago Police Board. Brumfield alleges that this disciplinary measure arose out of an "incident" in June 2006; the complaint provides no factual detail. The Police Board rejected the City's

discharge recommendation but suspended Brumfield without pay for 180 days.

In March 2009—before the suspension expired—the City again suspended Brumfield without pay pending discharge proceedings. Brumfield informs us in her brief that this suspension also related to an "incident" in June 2006, but again her complaint contains no factual detail. The Police Board did not discharge her but suspended her without pay for another 180 days.

In September 2009—before the Police Board had issued its second suspension order and before Brumfield returned to work—the City again suspended her without pay pending a third discharge proceeding. Brumfield's complaint does not specify the basis for this disciplinary measure, but in her brief she states that it arose from an April 2007 incident in which she told her captain that she was going to be injured on duty and then fell to the ground, feigning injury. This time the Police Board sustained the City's disciplinary charge and terminated Brumfield's employment.

In August 2010—with her earlier employment-discrimination case still pending—Brumfield filed a second lawsuit in the Northern District of Illinois focusing on her suspensions and discharge, which she alleged violated Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). This second suit also included a state-law claim for judicial review of the Police Board's latest suspension order and its decision to terminate her employment. The new case was also assigned to Judge Leinenweber. Brumfield eventually voluntarily dismissed the first case; it has

no further bearing on these appeals. The City then moved to dismiss the second case pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, advancing three arguments: (1) Title II of the ADA does not cover employment discrimination; (2) Title I, which *does* cover employment discrimination, was not available because Brumfield failed to exhaust administrative preconditions to filing suit; and (3) Brumfield failed to state a claim under either the ADA *or* the Rehabilitation Act. In an oral ruling, the district court dismissed the federal claims and relinquished supplemental jurisdiction over the state-law claim. The judge held that Title II of the ADA applies to the employment decisions of public entities like the City but that Brumfield's complaint failed to state a claim under either the ADA or the Rehabilitation Act. Brumfield appealed; this is Appeal No. 11-2265.

In August 2011 while her appeal was pending, Brumfield filed a third lawsuit against the City, this time alleging a violation of Title I of the ADA. The complaint contained no new factual allegations; the only difference was that Brumfield now alleged a claim under Title I of the ADA and complied with the administrative preconditions to suit. The new case was assigned to Judge Matthew Kennelly, who dismissed it as barred by res judicata. Brumfield appealed that judgment as well; this is Appeal No. 11-3836. We ordered the appeals consolidated.

## II. Discussion

### A. ADA Title II Claim

The district court dismissed Brumfield's Title II claim for failure to state a plausible claim for relief. In the process, however, the court held that Title II of the ADA prohibits disability discrimination in state and local public employment, supplementing the remedy provided in Title I. The City disagrees and argues that Title II does not apply.

Whether Title II applies to employment discrimination is an open question in this circuit. *Staats v. County of Sawyer*, 220 F.3d 511, 518 (7th Cir. 2000). The Supreme Court has noted the question but never directly addressed it. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 n.1 (2001). Three of our sister circuits, however, have directly decided the issue. The Ninth and Tenth Circuits have held that Title II unambiguously does not apply to employment-related disability discrimination. *See Elwell*, 693 F.3d at 1313–14; *Zimmerman*, 170 F.3d at 1178.[1] The

---

[1] The Second Circuit has held that Title II unambiguously does not apply to the employment decisions of public entities large enough to be covered by Title I but reserved the issue of whether Title II regulates the employment decisions of smaller public entities. *See Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144 (2d Cir. 2013). With a few inapplicable exceptions, Title I defines "employer" to mean "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person." 42 U.S.C. § 12111(5). So long as a public entity meets Title I's definition of "employer," its employment practices would fall within the scope of the ADA's employment-specific provisions. The Second Circuit decided the question whether Title II addresses the

(continued...)

Eleventh Circuit has reached the opposite conclusion. *See Bledsoe*, 133 F.3d at 825.[2]

---

(...continued)
employment practices of public entities primarily by comparing Title II of the ADA with Title I's more specific provisions rather than by grappling with the meaning of Title II itself. *See Mary Jo C.*, 707 F.3d at 168–69 ("We are persuaded primarily by the structure of the ADA, including differences between Title I and Title II, that Congress did not intend to extend Title II to employment discrimination claims, at least not those that are covered by Title I … ."). The court therefore reserved the question whether Title II addresses the employment practices of public entities not covered by Title I. *See id.* at 171 n.12 ("We need not, and do not, decide here whether a Title II claim may be brought against a public employer employing fewer than fifteen employees … .").

[2] Other circuits have addressed closely related issues. The Third Circuit, in a case determining whether Title III of the ADA prohibits disability discrimination in the employment context, has stated that "it is evident that Congress sought to regulate disability discrimination in the area of employment exclusively through Title I, notwithstanding the broad language of Title III." *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 118–19 (3d Cir. 1998). The Sixth Circuit faced the same issue and agreed that Title I is the only part of the ADA governing employment practices. *See Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) ("[T]he statutory framework of the ADA expressly limits discrimination in employment practices to Title I of the ADA … ."). The Fourth and Fifth Circuits have implicitly assumed that employment-discrimination claims are cognizable under Title II of the ADA, though neither court has directly confronted the issue. *See Holmes v. Tex. A&M Univ.*, 145 F.3d 681 (5th Cir. 1998) (engineering professor dismissed from university); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261 (4th Cir. 1995) (doctor dismissed from residency). Finally, the First Circuit has flagged the Title II issue as a difficult one and noted that "[t]he words 'public services, programs, or

(continued...)

We have considered whether it makes sense to leave the question undecided here. After all, Brumfield brought a Title I claim in her third suit, and there is no doubt that Title I prohibits employment discrimination on the basis of disability. *See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004) (The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III."). But we cannot sidestep the issue of Title II's scope by focusing on the Title I claim in Brumfield's third suit. Judge Kennelly dismissed that complaint and entered judgment on res judicata grounds. Although Brumfield argued against preclusion in the district court, her appellate briefing is silent on res judicata so she has waived the issue. *See Local 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.*, 495 F.3d 779, 783 (7th Cir. 2007) (arguments raised in the district court but not developed on appeal are waived). Brumfield's waiver is dispositive in Appeal No. 11-3836; with the res judicata bar in place and unchallenged, the Title I claim is precluded and the judgment is summarily affirmed. That leaves only Appeal No. 11-2265 and Brumfield's claims under Title II and the Rehabilitation Act. So we cannot avoid the Title II question and turn to it now.

Title II of the ADA provides: "[N]o qualified person with a disability shall, by reason of such disability, be excluded from

---

(...continued)

activities' do not necessarily exclude employment." *Currie v. Grp. Ins. Comm'n*, 290 F.3d 1, 6–7 (1st Cir. 2002).

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As used in Title II, the term "qualified individual with a disability" has its own special definition. It means:

> [A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Id.* § 12131(2). A "public entity" includes "any State or local government," and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1)(A)–(B).[3]

The Attorney General has promulgated a regulation stating that Title II applies to disability discrimination in public employment: "No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity." 28 C.F.R. § 35.140(a) (2012). Brumfield argues that we should defer to the Attorney General's interpre-

---

[3] Though not relevant here, Title II's definition of "public entity" also includes "the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49)." 42 U.S.C. § 12131(1)(C).

tation under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Not so fast. An agency's interpretation is entitled to *Chevron* deference if Congress has authorized the agency to interpret the statute through rules carrying the force of law and the agency's interpretation is both reasonable and promulgated through the exercise of the authority given by Congress. *See United States v. Mead Corp.*, 533 U.S. 218, 227–29 (2001); *see also White v. Scibana*, 390 F.3d 997, 1000 (7th Cir. 2004). But we do not address the deference question unless the statute is silent or ambiguous regarding the matter at hand. In other words, *Chevron* analysis proceeds in two steps. *See Emergency Servs. Billing Corp. v. Allstate Ins. Co.*, 668 F.3d 459, 465 (7th Cir. 2012). First, we determine whether the statute is silent or ambiguous on the question at issue—here, whether Title II of the ADA covers discrimination in public employment. If the statute is unambiguous on the question, we give effect to the unambiguous statutory language and the inquiry goes no further. *Id.* at 465–66. If the statute is silent or ambiguous, the second step is to determine whether the agency has promulgated a reasonable interpretation of the statute; if so, we defer to that interpretation. *Id.*

We conclude that Title II unambiguously does not apply to the employment decisions of state and local governments. To repeat: Title II provides that no eligible disabled person "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination" by a state or local unit of government. 42 U.S.C. § 12132. Our sister

circuits have helpfully divided § 12132 into two clauses for purposes of analysis: no otherwise eligible individual with a disability may be (1) "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity" by reason of such disability; or (2) "subjected to discrimination by" a public entity by reason of disability. *Id.*; *accord Elwell*, 693 F.3d at 1306; *Zimmerman*, 170 F.3d at 1174; *Bledsoe*, 133 F.3d at 821. No circuit has held that the first clause of § 12132 applies to public employment. *See Elwell*, 693 F.3d at 1306; *Zimmerman*, 170 F.3d at 1174; *Bledsoe*, 133 F.3d at 821–22. This is for good reason: Under the first clause of the statute, eligible disabled persons may not be excluded from "participation in" or denied "the benefits of" the "services, programs, or activities" of state and local government; employment is not ordinarily conceptualized as a "service, program, or activity" of a public entity.[4] *See Elwell*, 693 F.3d at 1306 ("[C]an

---

[4] It is true that "[t]here are two long-standing civil rights laws, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (1994 & Supp. IV 1998) and Title IX of the Education Amendments of 1972, 20 U.S.C. [§] 1681(a) (1994), under which the phrase 'program or activity' has been held to cover employment practices." *Currie*, 290 F.3d at 7 n.4 (citing *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 632–34 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520–35 (1982)). Even assuming that we could consider these uses of the phrase "program or activity" at this step in the *Chevron* analysis, *see Emergency Servs. Billing Corp. v. Allstate Ins. Co.*, 668 F.3d 459, 465–66 (7th Cir. 2012) (reserving the use of "comparative statutes" for the second step of the *Chevron* analysis), this would not change our view that the phrase "services, programs, and activities" in § 12132's first clause unambiguously does not refer to employment. Congress amended both Title IX and the Rehabilitation Act to confirm the Supreme Court's broad, early reading of

(continued...)

'employment' be described fairly as a service, program, or activity of a public entity … ? We think not."); *Zimmerman*, 170 F.3d at 1174 ("A common understanding of the first clause shows that it applies only to the 'outputs' of a public agency, not to 'inputs' such as employment."). We join the emerging consensus and hold that § 12132's first clause unambiguously does not address itself to disability discrimination in the employment context.

Unlike the first clause of § 12132, the second clause more broadly prohibits disability-based "discrimination," covering *all* forms of discrimination by state and local governments in

---

(...continued)

those statutes. *See* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, secs. 3(a), 4, 102 Stat. 28, 28–29 (1988) (codified at 20 U.S.C. § 1687, 29 U.S.C. § 794(b)) (providing that the phrase "program or activity" refers to "all of the operations of" covered entities in both Title IX and the Rehabilitation Act). Title II of the ADA—which was enacted *after* those amendments, *see* ADA, Pub. L. No. 101-336, tit. II, 104 Stat. 327, 337 (1990)—contains no similar broad definition for "services, programs, or activities" and thus no basis for reading that phrase in a counterintuitive way.

Perhaps our view would be different if the ADA didn't already prohibit disability discrimination in employment. But as we have noted and will explain more fully later in this opinion, Title I of the ADA covers employment comprehensively. While the Supreme Court may have found it necessary to read Title IX and the Rehabilitation Act broadly in the 1980s in order to effectuate their apparent purposes despite the absence of an explicit reference to employment, there is no similar need to read Title II of the ADA expansively because Title I already covers employment. *Cf. Darrone*, 465 U.S. at 632 n.13 ("[I]t was unnecessary to extend Title VI [of the Civil Rights Act of 1964] more generally to ban employment discrimination, as Title VII [of that act] comprehensively regulates such discrimination.").

the provision of public services, programs, or activities, not just the exclusion of disabled persons or the denial of benefits to them. But does this admittedly broader language extend to employment practices?

In isolation the second clause of § 12132 might seem ambiguous. But § 12132 does not exist in isolation and cannot be read as if it did. Section 12132 protects only "qualified individual[s] with a disability." Recall that the phrase "qualified individual with a disability" in Title II refers only to "an individual with a disability who … *meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity*." 42 U.S.C. § 12131(2) (emphasis added). As the Ninth Circuit has noted, "[o]btaining or retaining a job is not 'the receipt of services,' nor is employment a 'program or activity provided by a public entity.' " *Zimmerman*, 170 F.3d at 1176 (brackets omitted); *see also Elwell*, 693 F.3d at 1306. Thus, the class of people who may invoke § 12132's protection is limited to those eligible to receive or participate in the public entity's outputs. This leaves two interpretive options.

One is to interpret § 12132's second clause without regard to this context and hold that § 12132 covers all forms of discrimination in state and local governmental operations. Under this approach Title II's definition of "qualified individual with a disability" would have no bearing on the meaning of "discrimination" in § 12132. Of course, the definition of "qualified individual with a disability" would continue to limit the class of disabled persons eligible to proceed under § 12132. This would mean that the statute covers disabled employees

who also happen to be eligible to receive or participate in their respective employers' services, programs, or activities. *See Elwell*, 693 F.3d at 1308 ("[I]f the second clause of § 12132 expanded liability to *all* of a public entity's operations, … it would do so only for a *limited* class of disabled employees—for those who happen to be eligible to participate in an agency's outputs."); *Zimmerman*, 170 F.3d at 1175. That is a highly unlikely interpretation even when Title II is viewed in isolation, *Elwell*, 693 F.3d at 1308, and we reject it as unambiguously incorrect.

The second, and sensible, way to read Title II's prohibition against disability-based discrimination is to read it in context and in conjunction with the applicable definition of "qualified individual with a disability." Since the only people who can invoke the protection of Title II are those who are eligible to receive or participate in the services, programs, or activities offered by state and local governments, the statute's prohibition against discrimination is properly read to cover all types of disability discrimination in the "outputs" of state and local government—their delivery of public services, programs, and activities to eligible recipients. It does not also cover discrimination in employment relations, which are part of the internal operations of state and local government.

This reading is confirmed if we expand our focus and consider Title II in light of the ADA as a whole. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) ("In making the threshold determination under *Chevron*, a reviewing court should not confine itself to examining a particular statutory provision in isolation. Rather, the

meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (alteration marks, citations, and internal quotation marks omitted)). The statute should be read to perform a nonredundant role in the broader statutory scheme. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)). So read, Title II is clearly inapplicable to employment discrimination because Title I specifically, comprehensively, and exclusively addresses disability discrimination in employment.

Unlike Title II, Title I defines "qualified individual" as "an individual who, with or without reasonable accommodation, can *perform the essential functions of the employment position that such individual holds or desires*." 42 U.S.C. § 12111(8) (emphasis added).[5] And it protects these individuals against disability-based discrimination "in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* § 12112(a). This provision in Title I—and particularly the final catch-all phrase—covers the waterfront of employment-related claims.

---

[5] Title I of the ADA was amended effective January 1, 2009. Because the amendments do not affect our analysis of the case, we refer throughout to the amended ADA.

Furthermore, Title I provides employment-specific definitions of terms such as "reasonable accommodation" and "undue hardship," *id.* § 12111(9)–(10), lists defenses specific to employers, *see id.* § 12113, and requires the Equal Employment Opportunity Commission—an agency that administers other statutes relating specifically to employment discrimination—to issue regulations carrying out Title I, *see id.* § 12116.[6] The presence of a comprehensive employment-specific regulatory scheme sitting right next door in Title I confirms our reading

---

[6] The Ninth and Tenth Circuits have noted that Title I imposes administrative preconditions to filing suit whereas Title II does not. *See Elwell v. Okla. ex rel. Bd. of Regents of the Univ. of Okla.*, 693 F.3d 1303, 1309 (10th Cir. 2012); *Zimmerman v. Or. Dep't of Justice,* 170 F.3d 1169, 1178 (9th Cir. 1999) (citing *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990)). This is another textual indicator that Title II does not apply to employment because any other reading would render Title I's requirements a nullity for employees of public entities that fall within its scope. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)). We have not previously addressed the question whether Title II imposes similar requirements, and because the parties in this case seem to agree that it doesn't, we do not address the issue here. *Cf. Mary Jo C.*, 707 F.3d at 170 n.11 (declining to address the issue); *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000) (citing with approval the "general pronouncement" in *Charlie F. v. Board of Education of Skokie School District 68*, 98 F.3d 989, 991 (7th Cir. 1996), that satisfying administrative preconditions in civil-rights cases is not a jurisdictional requirement that we would have a duty to address sua sponte).

of Title II.[7] *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070–71 (2012) (noting that when Congress has enacted a "comprehensive scheme and has deliberately targeted specific problems with specific solutions," that scheme will govern over more general statutory language that could be read to cover the same problems (internal quotation marks omitted)); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (internal quotation marks omitted)); *see also Elwell*, 693 F.3d at 1310 (explaining that Title I of the ADA should govern over the less-specific Title II on the question of employment discrimination).

The Eleventh Circuit arrived at a different conclusion in *Bledsoe*. *See* 133 F.3d 816. Like the Ninth and Tenth Circuits, we find its analysis unpersuasive. *See Zimmerman*, 170 F.3d at 1183–84; *Elwell*, 693 F.3d at 1314. The Eleventh Circuit never considered the specific definition of "qualified individual with a disability" found in Title II. Indeed, *Bledsoe* began its analysis by dismissing Title II's language as "brief," noting only that

---

[7] We note as well that there is no requirement that Title I and Title II be implemented in a coordinated fashion *Cf.* 42 U.S.C. § 12117(b) (requiring the EEOC and the Attorney General to develop procedures ensuring that administrative employment-discrimination complaints filed under Title I and the Rehabilitation Act "are dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements").

§ 12132's last phrase prohibits "all discrimination" by a public entity. 133 F.3d at 821–22. Without further discussion, the court moved immediately to the statute's legislative history where it found several statements to support the view that Title II prohibits public entities from engaging in employment discrimination. In light of the legislative history, the court found the Attorney General's regulation worthy of *Chevron* deference. *Id.* at 822–23. The Eleventh Circuit also relied heavily on certain dicta in circuit precedent. *See id.* at 823 ("[W]ithout directly discussing the issue with which this court is presently faced, our court has assumed that Title II covers public employment discrimination."). Indeed, one member of the panel, "concur[ring] with reluctance," suggested that the court's "precedent" had dictated the result. *Id.* at 825 (Hill, J., concurring specially). We are not similarly constrained.

For the foregoing reasons, we join the Ninth and Tenth Circuits and hold that Title II of the ADA does not cover disability-based employment discrimination. Instead, employment-discrimination claims must proceed under Title I of the ADA, which addresses itself specifically to employment discrimination and, among other things, requires the plaintiff to satisfy certain administrative preconditions to filing suit. *See* 42 U.S.C. §§ 12117(a), 2000e-5. Brumfield's Title II claim was properly dismissed.

**B. Rehabilitation Act Claim**

The Rehabilitation Act provides:

> No otherwise qualified individual with a disabil-
> ity in the United States, as defined in section
> 705(20) of this title, shall, solely by reason of her
> or his disability, be excluded from the participa-
> tion in, be denied the benefits of, or be subjected
> to discrimination under any program or activity
> receiving Federal financial assistance … .

29 U.S.C. § 794(a). Aside from the "solely by reason of"
standard of causation, which is unique to this statute and not
present in the ADA, *see Washington v. Ind. High Sch. Athletic
Ass'n*, 181 F.3d 840, 845 n.6 (7th Cir. 1999); *see also Lewis v.
Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en
banc), the Rehabilitation Act incorporates the standards
applicable to Title I of the ADA. 29 U.S.C. § 794(d); *see also id.*
§ 705(20)(B); *Silk v. City of Chicago*, 194 F.3d 788, 798 n.7 (7th
Cir. 1999). The ADA defines the term "discriminate against a
qualified individual on the basis of disability" to include not
only discharging an employee on the basis of disability, but
also failing to make "reasonable accommodations to the known
physical or mental limitations of an otherwise qualified
individual with a disability who is an applicant or employee,
unless [the employer] can demonstrate that the accommoda-
tion would impose an undue hardship on the operation of the
business of [the employer]." 42 U.S.C. § 12112(b)(5)(A); *see
Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd
Judicial Circuits*, 601 F.3d 674, 678 & n.2 (7th Cir. 2010) (analyz-
ing a failure-to-accommodate claim under the Rehabilitation
Act by reference to the standards applicable to such claims
under the ADA).

We agree with the district court that Brumfield failed to state a claim with respect to her disciplinary suspensions and discharge. We note first that her complaint is vague on nearly everything and provides few specifics on the nature of her disability or the circumstances surrounding her suspensions and discharge. Setting aside whether her allegations are sufficiently nonconclusory to pass muster under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Brumfield never actually alleges that the City suspended or fired her by reason of her alleged disability. Indeed, she contends that her first and second suspensions were based on "incidents" that had transpired in June 2006, and that her third suspension and the decision to terminate her employment were based at least in part on the April 2007 "feigned injury" incident.

Brumfield argues that her conduct during the feigned-injury incident was merely a manifestation of her psychological problems and that she was therefore discharged because of her disability. This does not save her claim, however. An employer may fire an employee for engaging in unacceptable workplace behavior without violating the ADA (or the Rehabilitation Act), even if the behavior was precipitated by a mental illness. *See, e.g.*, *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997); *Palmer v. Circuit Court of Cook Cnty.*, 117 F.3d 351, 352 (7th Cir. 1997); *McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 172 (2d Cir. 2006); *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 (9th Cir. 1995); *cf. Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.6 (2003). The Rehabilitation Act

protects qualified employees from discrimination "solely by reason of" disability, meaning that if an employer fires an employee for any reason other than that she is disabled—"even if the reason is the consequence of the disability"—there has been no violation of the Rehabilitation Act.[8] *See Matthews*, 128 F.3d at 1196 (stating a similar proposition in the context of the ADA). Brumfield does not claim that the City's reason for terminating her employment was a pretext for disability discrimination.

Brumfield also argues that she adequately alleged a failure-to-accommodate claim under the ADA (and, therefore, the Rehabilitation Act), citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005). In *Sears* we listed the following elements of a failure-to-accommodate claim: (1) the plaintiff must be a qualified individual with a disability; (2) the

---

[8] Brumfield alleged that she was qualified for her job and gives no indication that engaging in misconduct was a frequent symptom of her psychological condition. Where a disability so prevents an employee from performing the essential functions of her job that no reasonable accommodation could enable her to perform those functions, the employee is not qualified for the position and therefore has no claim under the ADA (or the Rehabilitation Act). *See* 42 U.S.C. § 12111(8) (defining "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008) ("It is clear that a worker who cannot do the job even with a reasonable accommodation has no claim under the ADA. This is true even if the employee's inability to perform the job is due entirely to a disability." (citations and internal quotation marks omitted)); *see also Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997); *Palmer v. Circuit Court of Cook Cnty.*, 117 F.3d 351, 352 (7th Cir. 1997).

employer must be aware of the plaintiff's disability; and (3) the employer must have failed to reasonably accommodate the disability. *Id.* at 797; *see also Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011). While this formulation usually captures the essence of a failure-to-accommodate claim under the ADA and Rehabilitation Act, this case highlights a certain imprecision in the first element.

Subject to a few exceptions not relevant here, the ADA defines the term "qualified individual" to mean "an individual who, *with or without* reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). All persons who meet this definition fall within the scope of the ADA's general antidiscrimination provision. *See id.* § 12112(a). However, as explained in more detail below, only individuals who possess "physical or mental limitations" but are "*otherwise* qualified" for the job are eligible for reasonable accommodations. *See id.* § 12112(b)(5)(A) (emphasis added). The *Sears* formulation should not be understood to enable a plaintiff to state a failure-to-accommodate claim against her employer even though she was able to perform all essential functions of her job without regard to her physical or mental limitations.

That's the fundamental flaw in Brumfield's failure-to-accommodate argument. The ADA is designed to prohibit discrimination against employees whose disabilities have no bearing on their ability to perform a given job, but also to ensure employment opportunities for "disabled persons who are otherwise qualified for a job, but as a result of a disability

are unable [to] perform the job's essential functions without reasonable accommodations." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005) (emphasis omitted); *see also* 42 U.S.C. §§ 12111(8), 12112(b)(5)(A). The ADA accomplishes the latter goal by providing that an employer engages in unlawful disability discrimination when it fails to provide reasonable accommodations for "the known physical or mental limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A). But it is important to recognize that the statute requires reasonable accommodation *only* in this situation. Whereas the ADA's other antidiscrimination provisions protect *all* qualified individuals, the reasonable-accommodation requirement applies only to the known physical or mental limitations of *otherwise* qualified individuals.

We have not specifically addressed the term "otherwise qualified individual" as it appears in the reasonable-accommodation provision. However, the meaning of the term can be extrapolated from our two-part test for determining whether an individual is "qualified" within the meaning of the ADA, *see Hammel*, 407 F.3d at 862, a test that tracks the applicable regulations, 29 C.F.R. § 1630.2(m); *see also id.* pt. 1630, app. at 1630.2(m) (explaining that "[t]he determination of whether an individual with a disability is 'qualified' should be made in two steps"). First, the individual must meet the employer's "legitimate selection criteri[a]." *Hammel*, 407 F.3d at 862. This means that the individual must be qualified on paper by, for example, possessing "the requisite skill, experience, education and other job-related requirements of the employment position" at issue. 29 C.F.R. § 1630.2(m). Second, the individual

must be "capable of performing the job's 'essential functions' with or without reasonable accommodation from an employer." *Hammel*, 407 F.3d at 862. This second part of the test encompasses two categories of paper-qualified individuals with disabilities: those who are able to perform the essential functions of the job even without reasonable accommodation, and those who could do so if the employer were to make an accommodation for their physical or mental limitations. Since members of the first category are qualified for the position in *every* relevant respect, only the members of the latter category are individuals who have "physical or mental limitations" but are "*otherwise* qualified" for the position. 42 U.S.C. § 12112(b)(5)(A) (emphasis added). Thus, an employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job. *See id.* §§ 12111(8), 12112(b)(5)(A); *Hammel*, 407 F.3d at 862.

It follows that an employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of her job—not because such an accommodation might be unreasonable, but because the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place. *See Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) ("If the disability affects the employee's work ability, the employer must then consider if a 'reasonable accommodation' can be made."); *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995) ("To 'accommodate' a disability is to make some change that will enable the disabled person to work."); *see also U.S. Airways v. Barnett*, 535 U.S. 391, 397 (2002) ("The [ADA]

requires preferences in the form of 'reasonable accommoda-
tions' that are needed for those with disabilities to obtain the
same *workplace opportunities* that those without disabilities
automatically enjoy." (emphasis altered)). A disabled employee
who is capable of performing the essential functions of a job in
spite of her physical or mental limitations is qualified for the
job, and the ADA prevents the employer from discriminating
against her on the basis of her irrelevant disability. But since
the employee's limitations do not affect her ability to perform
those essential functions, the employer's duty to accommodate
is not implicated. *Cf. Hoffman v. Caterpillar, Inc.*, 256 F.3d 568,
577 (7th Cir. 2001) ("[N]othing in the [ADA] requires an
employer to accommodate the employee so that she may
perform any nonessential function [of the job at issue] that she
chooses.").

This explains why the EEOC defines "reasonable accommo-
dation" to refer to workplace adjustments "that enable an
individual with a disability who is qualified to perform the
essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).
It also makes sense of the requirement that the employer
provide such accommodations in the first place. *See* JOHN
PARRY, DISABILITY DISCRIMINATION LAW, EVIDENCE AND
TESTIMONY 172 (2008) ("Reasonable accommodations are
intended to remove barriers that would prevent employees
with disabilities from properly performing their duties."). This
is not to say that reasonable accommodations are available
only to individuals whose impairments substantially limit the
major life activity of working. Rather, to be entitled to an
accommodation, a disabled employee must have a physical or
mental limitation that prevents her from performing an

essential function of the particular job at issue and "there must be some causal connection between the major life activity that is limited and the accommodation sought." *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 785 (7th Cir. 2007) (citing *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 848 (8th Cir. 2005)) (holding that an employer need not accommodate an employee's back injuries simply because they substantially limited the employee's ability to engage in sexual relations).

In sum, the ADA does not require an employer to accommodate disabilities that have no bearing on an employee's ability to perform the essential functions of her job. Thus, to satisfy the first element of a failure-to-accommodate claim, the plaintiff must show that she met the employer's legitimate selection criteria and needed an accommodation to perform the essential functions of the job at issue (i.e., that she was "otherwise qualified" under 42 U.S.C. § 12112(b)(5), not merely "qualified" under § 12111(8)).

Brumfield insists that the City owed her an accommodation, but nothing in her complaint suggests that her disability affected her ability to do any aspect of her job. To state a failure-to-accommodate claim against the City, Brumfield needed to allege facts to support an inference that her "psychological problems" prevented her from performing an essential function of her job. Quite the opposite, Brumfield's four psychological examinations determined that she was fit for duty as a police officer. The examiners apparently reported that she was vulnerable to workplace stress, but Brumfield doesn't allege that this vulnerability prevented her from performing an essential function of her job, rendering her

disabled but "otherwise qualified" for it. The district court properly dismissed Brumfield's Rehabilitation Act claim.

AFFIRMED.