In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2047

EILEEN M. FELIX,

*Plaintiff-Appellant,*

*v.*

WISCONSIN DEPARTMENT OF
TRANSPORTATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin,.
No. 1:13-cv-01188-WCG — **William C. Griesbach**, *Chief Judge.*

ARGUED FEBRUARY 12, 2016 — DECIDED JULY 6, 2016

Before WOOD, *Chief Judge*, ROVNER, *Circuit Judge*, and
BLAKEY, *District Judge.*[*]

ROVNER, *Circuit Judge.* Eileen Felix sued her former em-
ployer, the Wisconsin Department of Transportation, under the

---

[*]   The Honorable John Robert Blakey, of the Northern District of Illinois,
sitting by designation.

Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.*, contending that she was discharged solely because of an anxiety disorder and related disabilities. The district court entered summary judgment against Felix, reasoning that the undisputed facts demonstrated that she was discharged not solely because of her disabilities but rather based on workplace behavior that indicated to her employer that she posed a safety risk to herself and others. *Felix v. Wis. Dep't of Transp.*, 104 F. Supp. 3d 945 (E.D. Wis. 2015). We affirm.

## I.

Eileen Felix suffers from a variety of mental health disabilities, including post-traumatic stress disorder ("PTSD"), major depressive disorder, anxiety, obsessive compulsive disorder, and a medical phobia. For ease of reference, and because her PTSD and anxiety disability appear to be the conditions most relevant to the facts of this case, we will refer to her disabilities collectively as an anxiety disorder. She manages the symptoms of her disorder by taking prescribed medication and attending counseling and therapy sessions.

Felix was employed by the Wisconsin Department of Transportation ("WisDOT") from 1998 to 2013 in the Division of Motor Vehicles ("DMV") customer service facility in Appleton, Wisconsin. At the time of her discharge in 2013, she held the position of DMV Field Agent Examiner - Advanced. Her duties included administering road tests to new drivers applying for licenses (approximately 20 per week) and performing a variety of duties behind the counter at the DMV office, including processing paperwork for vehicle and driver's licenses and other DMV documentation and collecting the fees

associated with these transactions. She was regarded as a good employee overall: "she was punctual, reliable, friendly with customers, and patient with new drivers." R. 26 at 4. She excelled in administering road tests.

The one area in which Felix tended not to meet expectations was in financial accountability. She would occasionally collect the wrong fee amount from a customer or key in the wrong amount in recording a transaction, accept an unsigned or undated check, or make an error in tallying customer payments that would result in discrepancies between her record-keeping and the amount actually present in her cash register at the close of business. Prior to 2011, her performance in this area was rated unsatisfactory in seven annual reviews, but her performance overall was nonetheless deemed satisfactory. In 2011, however, a rule change precluded an overall rating of satisfactory if the employee did not meet expectations in certain specified areas, including financial accountability. Because WisDOT determined that Felix did not meet financial accountability performance standards in 2011, she was given an overall evaluation of unsatisfactory. Felix was placed on probation from April through September 2012 on this basis, and she received an unsatisfactory evaluation at the end of that period when her difficulties persisted. Her performance improved during a consecutive three-month probationary period that ended in December 2012. But her performance evaluation at the end of the first quarter in 2013 reflected renewed problems. Under WisDOT's procedures, this called for the commencement of a final performance improvement plan which, if Felix did not complete successfully, would result in her discharge. Felix contacted WisDOT's human resources

director, Randy Sarver, on both April 17 and 18, 2013, regarding her evaluation. She was concerned about the evaluation and the possibility that she was at risk of losing her job.

Prior to April 18, Felix had experienced a number of panic attacks at work, but typically not in front of others and not in the public areas of the office. One exception was an attack that occurred on June 19, 2012, after a supervisor informed her that her cash drawer was missing ten dollars and a check. She was noticeably upset, and reported to a supervisor that she was having difficulty breathing and holding back tears and needed to leave work. She was then absent from work for the remainder of the week. It was at that time that she first apprised her employer that she suffered from an anxiety-related disorder. But in general, if Felix felt an attack coming on, she would inform her supervisor that she needed to retreat to the restroom for 15 minutes and do some breathing exercises, after which she could return to her station and continue working.

Felix had also explored the possibility of a transfer to another WisDOT facility. She requested a transfer to the Eau Claire DMV facility in or around June 2012. But because she was subject to a performance improvement plan due to her unsatisfactory performance, she was deemed ineligible for a transfer at that time. She later inquired about the possibility of a medical transfer as an accommodation to her disability, but according to WisDOT, she never followed through on the inquiry by completing and submitting the appropriate paperwork.

On the morning of April 18, 2013, a coworker known by the nickname "Ace" came into Felix's work area at the DMV to

look through some reference materials that were stored on a shelf. (Felix and Ace were at one time on friendly terms, but they had fallen out several years earlier. Felix had filed an incident report early in 2012 contending that Ace had intentionally rammed her with her shoulder. WisDOT investigated the report but had been unable to substantiate Felix's allegations.) Ace bent over while looking through the reference materials, and when she straightened up at the conclusion of her search, static electricity caused strands of her long hair to cling to Felix's person. As Ace left the area, Felix felt a panic attack coming on. She went to her supervisor, Cliff Ehlert, and told him that she needed to visit the restroom in order to calm down. Ehlert told her to take all the time she needed.

About 30 minutes later, Ehlert heard muffled screaming coming from the public lobby of the office. As he was rising from his desk to investigate, an employee told him that Felix had fallen down. When Ehlert arrived in the lobby area, he saw Felix on the floor behind one of the work counters. She was lying on her side, clutching her cell phone, and crying out. Ehlert noticed that she had marks, scratches, and cuts on her right wrist, some of which were bleeding slightly. As Felix struggled to speak through her cries, Ehlert could only make out some of what she was saying. He would later recall her saying that "[y]ou all hate me … they all hate you … everybody hates you" and "[t]hey think you're crazy … you all think I'm crazy … they want to get rid of you." R. 36 at 55 ¶ 89. She also said, "I want my insurance … they will take your insurance … don't let them take your insurance …"and "I need to get my money—don't take my money … they don't trust you … they steal your money." R. 36 at 55 ¶ 89. At one point, Felix

rolled onto her back and began kicking her legs. Ehlert then noticed that she also had scratches and cuts on her left wrist. Ehlert heard Felix say, "They're too dull … the knives were too dull" and "God let me die … I just want to die." R. 36 at 56 ¶ 91. Felix would later aver that at no time had she ever been suicidal, including during the April 18th incident.

Emergency personnel were summoned to the DMV by an employee's 9-1-1 call. A paramedic and a co-worker eventually succeeded in calming Felix down and moving her to a break room. She was ultimately transported to the hospital. Felix's co-workers were shaken and concerned by the incident. Ehlert subsequently brought in a counselor to meet with staff members.

On the following day, in response to an email inquiry from regional manager Don Genin, Sarver indicated that Felix would have to undergo an independent medical examination ("IME") in order to determine whether she could return to work. Sarver wanted the IME to consider both her own safety and the safety of others in the workplace. Ehlert, as Felix's supervisor, was concerned about the fact that Felix's road-test responsibilities regularly placed her alone in automobiles with 16-year-old drivers seeking their first licenses. He wanted to be sure that Felix would not have another panic attack during one of these tests. Sarver thus notified Felix by letter on April 25, 2013, that she would be required to participate in a fitness-for-duty evaluation as a result of the events of April 18, and that she would not be able to return to work until this evaluation had been conducted and the results reviewed by management

personnel.[1] At no time between the April 18th episode and Felix's subsequent discharge did WisDOT permit Felix to return to work.

Meanwhile, on April 19, Ehlert and Genin signed an evaluation officially deeming Felix's performance during the preceding three-month performance improvement period to be unsatisfactory. They were aware, obviously, that Felix was out of the office, but their evaluation was due to human resources and they did not know when Felix would return. In view of the negative rating, Felix thereafter would be subject to a final performance improvement plan if and when she returned to work.

Ehlert, in the meantime, filled out a Family & Medical Leave Act ("FMLA") leave request on Felix's behalf several days after the incident. After speaking with Felix about the request, he submitted the form on April 24. Felix's daughter subsequently delivered a notice from Dr. Michael Panzer, a physician who had seen Felix in the emergency room following the April 18th episode, indicating that Felix would be "unable to work for medical reasons" until she saw her doctor on May 22. R. 25 Ex. A.

---

[1] The letter cited Wis. Stat. § 230.37(2) as authority for the IME. That statute in relevant part provides that a state employer may demote, reassign, reschedule, or (as a last resort) discharge an employee who becomes physically or mentally incapable of efficiently and effectively performing the duties of his position by reason of a disability; the statute also authorizes the employer to require an employee to submit to a medical or physical examination in order to determine his fitness to continue in service.

WisDOT designated Dr. Daniel Burbach, an independent medical examiner, to examine Felix and determine whether she could safely resume her duties.[2] Rebecca English, WisDOT's medical coordinator, emailed Felix on May 8 to advise her that her fitness-for-duty examination with Burbach was scheduled for May 28, 2013. English "strongly recommend[ed]" that Felix provide pertinent medical information from her treating professionals directly to Burbach prior to the examination. R. 20-1 DOJ 146. (Sarver had given her the same recommendation in his April 25th letter to Felix.) Felix instead provided a list of her providers to Burbach and a signed release, thinking it would be simpler for Burbach to contact them directly. Burbach saw Felix as scheduled on May 28. According to Felix, he spoke with her for no more than 30 minutes. Burbach also conducted two collateral interviews as part of his evaluation, but the record does not disclose with whom, other than Felix, he spoke. Burbach evidently did not obtain records from either of the two mental health professionals Felix was then seeing for her anxiety-related conditions—Dr. John Thomas Beld, her psychiatrist, and John R. Pilon, a licensed professional counselor—or from her family practitioner, Dr. Meena P. Vir.

On June 2, WisDOT received Burbach's IME. Burbach concluded that "Ms. Felix remains at increased risk for potentially violent behavior toward self _and_ others within the workplace." Ex. 1001 DOJ 493. (emphasis in original). He added that on the basis of his evaluation,

---

[2]  Burbach was not employed by or affiliated with WisDOT. He was selected by or recommended to WisDOT by PsyBar, a private third-party vendor.

> I would predict future episodes of crying, complaining, excuse making, blaming others, isolation/estrangement, resistance to supervisory efforts, retaliatory verbal threats, purposeful provocation/antagonism of others, angry and irrational outbursts (e.g. shouting, screaming, slamming door/drawers, breaking items), physical altercations with coworkers (e.g., shoving, elbowing, shouldering, slapping), self-inflicted injuries, suicidal threats and gestures (e.g., vague suicidal comments, non-lethal self-cutting or pill ingestion), and true suicidal efforts.

Ex. 1001 DOJ 494. Burbach opined that "Ms. Felix is unable to safely and effectively resume her position at the Appleton DMV Service Center." Ex. 1001 DOJ 496. "Less clear," he added, "is whether she would be able to do so at another DMV Service Center subsequent to additional psychiatric treatment." Ex. 1001 DOJ 496. In the exercise of his professional judgment, Burbach "would not recommend that Ms. Felix be permitted by the Wisconsin DOT to continue in her current position at the Appleton DMV Service Center." Ex. 1001 DOJ 497 (emphasis in original). Burbach noted that his opinions were not based on Felix's current course of treatment.

On June 19, Sarver provided Felix with a copy of Burbach's report along with a letter inviting her to submit any other information that Felix believed would be relevant to assessing her status with WisDOT. Sarver noted in the letter that WisDOT was considering the possibility of discharging her. Separately, English had been working with Felix since May to gather additional documentation required as support for her

ongoing FMLA leave. Felix's psychiatrist, Dr. Beld, had submitted an incomplete form to WisDOT on May 28. English followed up with Felix on June 6 to advise her that WisDOT required complete documentation by June 17. Despite a number of reminders, Felix did not submit the requested documents by that deadline. English received a completed form from Dr. Beld on June 19 indicating that Felix could return to work on July 15, 2013, but should work on a part-time basis of 20 hours per week until August 20, 2013. Some of Dr. Beld's handwriting on the form was illegible to English. She was able to read Beld's observation that "current work environment worsens the above, she may tolerate a new work environment better." Ex. 1001 DOJ 489.[3] On June 24, Felix supplied English with a follow-up note from Beld stating simply, "Please allow my patient to return to work starting July 15, 2013." Ex. 1001 DOJ 465. That note made no mention of Felix working initially on a part-time basis when she returned and offered no explanation for Beld's apparent conclusion that Felix was ready to return to work on a full-time basis. English also received and reviewed a variety of medical records from Felix's other medical and counseling providers, but none of these records included a statement or opinion as to whether Felix was fit to return to work. Only Beld's note addressed that question, albeit in summary fashion. The

---

[3] Beld would later note in his declaration that the form reflected his findings that Felix was suffering from depression and anxiety; that her depression was negatively affecting her mood, energy, motivation, and functioning; that her anxiety was negatively affecting her stress tolerance; and that Felix would continue with follow-up visits with Beld and with medical management as part of her treatment plan.

medical certification form he submitted added only that Felix would continue her course of therapy with him and with medical management of her condition. But as English had noticed, Beld himself had indicated on that form that Felix's current work environment tended to aggravate her condition.

English, believing that she needed additional information from Beld, followed up with him directly. At that time, English learned that Beld lives in Utah and sees his patients, including Felix, by video conference. Beld spoke with English on June 25. He informed English that he was aware of the April 18th episode and that Felix had undergone a fitness-for-duty evaluation, but he told English he had not spoken with Burbach and declined to see a copy of Burbach's report. In an apparent reference to the possibility of a transfer, English advised Beld that Felix was subject to a "final improvement plan" and would not be changing work locations. Beld stated that Felix could safely return to work and was capable of resuming her duties at the Appleton DMV facility. According to Beld, English voiced disagreement with his assessment that Felix posed no "risk" to herself or others. Beld inferred from her tone and attitude that English was simply assuming that because Felix had posed a risk at one time she must still be a risk now, and he told her that, in his view, she was wrong to make this assumption. Beld would later aver that English's remarks and attitude betrayed "a shocking level of stigmatization against [Felix] based on her mental illness." R. 33 at 5 ¶ 22 & Ex. Felix 35.

WisDOT determined that Felix was unfit for continued employment and terminated her on that basis. It considered the information supplied by Felix's medical providers, includ-

ing Beld, but concluded in light of Burbach's independent medical assessment that she could not safely perform her duties at the Appleton DMV office. It considered her ineligible for transfer to another office because, in view of her persistent failure to meet expectations as to financial accountability, she was subject to a final performance improvement plan. Felix had been on FMLA leave since the April 18th incident and would exhaust all of her available state and federal leave time by July 12. On June 26, WisDOT notified Felix by letter that it intended to discharge her effective July 12. The letter cited the episode of April 18, which it described as "a critical incident … that called into question your own safety as well as the safety of your coworkers and the general public." R. 25-9 at 1. As a result of that incident, the letter explained, an IME had been called for to evaluate her fitness for duty. The results of the IME indicated that Felix remained unfit for duty. The letter went on to reference essentially the same portions of the IME from which we ourselves have quoted. WisDOT had considered the additional information that Felix had submitted, but "this information did not contribute new information about your ability to perform your job duties in a safe, efficient and effective manner." R. 25-9 at 2. WisDOT had thus resolved to terminate Felix's employment.

Felix filed suit against WisDOT pursuant to the Rehabilitation Act and the FMLA, 29 U.S.C. § 2601 *et seq.* She subsequently stipulated to a dismissal of one of her two FMLA claims and she does not challenge the resolution of the other FMLA claim on appeal.

The district court granted summary judgment to WisDOT on Felix's claim that she was discharged in violation of the

Rehabilitation Act.[4] It found that the undisputed facts demonstrated that Felix's termination was based not solely on her disability but rather on her behavior, the disruption it caused in the workplace, and the danger it posed to herself and others. *Felix*, 104 F. Supp. 2d at 954-55 The court rejected Felix's contention that WisDOT was necessarily making a "direct threat" defense that it had not pleaded as an affirmative defense and as to which WisDOT would bear the burden of proof. *Id.* at 953. Instead, the court understood WisDOT to be arguing, consistent with *Palmer v. Circuit Ct. of Cook Cnty.*, 117 F.3d 351, 352 (7th Cir. 1997), and *Brumfield v. City of Chicago*, 735 F.3d 619, 630-31 (7th Cir. 2013), that Felix's behavior during the April 18th incident demonstrated that she was not qualified to continue in WisDOT's employ, irrespective of the fact that the behavior was caused by her disabilities.

> Hysterical screaming and suicidal behavior by an employee in front of co-workers and members of the public is simply not something an employer generally has to tolerate or accommodate. … Absent a disability, an employer would be entirely justified in terminating an employee who engaged in such behavior immediately. Here, because of the perceived mental health component, the DOT required Felix to undergo a fitness for duty evaluation before she would be allowed to return. Upon reading the resulting

---

[4]   Felix also argued below, unsuccessfully, that WisDOT had failed to accommodate her disabilities by not transferring her to a different office. Felix has not challenged the district court's disposition of that claim.

> report and considering the submissions by
> Felix's doctors, the DOT decided to terminate
> her employment.

*Id.* at 954. In the wake of the April 18th episode, the district court reasoned, WisDOT had ample cause to be concerned not only for Felix's own safety, but for the safety of her co-workers and members of the general public, including the new drivers to whom she administered road tests. Dr. Burbach's report concluded that Felix remained at risk for potentially violent behavior toward herself and others, and the Department was entitled to rely on Dr. Burbach in discharging Felix, notwithstanding the contrary opinion of Felix's own therapists. *Id.* at 955. Ultimately, "Felix has offered no evidence suggesting that the DOT was not truly convinced that she was unfit for duty as a result of her outburst on April 18, 2013, and instead fired her because of a disability." *Id.*

## II.

Felix argues there are disputes of material fact that preclude summary judgment, including disputes as to whether she was discharged solely because of her disabilities and whether, after the April 18th episode, she remained a qualified individual with a disability who was able to perform the essential functions of her job and did not present a direct threat to the safety of herself and others in the workplace. She contends that the court improperly weighed the evidence in entering summary judgment against her, and additionally that it did not employ the correct legal analysis in assessing the record.

Section 504 of the Rehabilitation Act, as amended, protects a "qualified individual with a disability" from discrimination

"solely by reason of" her disability in any program receiving federal assistance. 29 U.S.C. § 794(a). To succeed on a claim of employment discrimination under this statute, a plaintiff must prove that: (1) she is disabled within the meaning of the statute; (2) that she was otherwise qualified for the job in question; (3) that she was discharged or the subject of other adverse action solely because of her disability; and (4) the employment program of which her job was a part received federal financial assistance. *See Novak v. Bd. of Trustees of S. Ill. Univ.*, 777 F.3d 966, 974 (7th Cir. 2015); *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005); *Branham v. Snow*, 392 F.3d 896, 902 (7th Cir. 2004); *Silk v. City of Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999). In this case, there is no dispute that Felix is disabled for purposes of the Rehabilitation Act or that WisDOT receives federal financial assistance and is therefore subject to the Act's provisions. The parties do dispute whether Felix was otherwise qualified for continued employment following the April 18th incident and whether she was discharged solely because of her disabilities.

As they were below, the parties are at odds as to the particular legal criteria and burdens that govern their dispute. We have just noted that Felix bears the burden under the Rehabilitation Act to show that, notwithstanding her disabilities, she was otherwise qualified to perform the essential functions of her job. WisDOT contends that in view of our decision in *Palmer*, Felix cannot make that showing. *Palmer* held that when an employee engages in behavior that is unacceptable in the workplace (there, making phone calls to her office threatening her supervisor with bodily harm), the fact that the behavior is precipitated by her mental illness

"does not present an issue under the Americans with Disabilities Act"; the behavior itself disqualifies her from continued employment and justifies her discharge. 117 F.3d at 352.

> The Act does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone. The Act protects only "qualified" employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one.

*Id.* (collecting cases); *see also Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (7th Cir. 1999); *Duncan v. Wis. Dep't of Health & Family Servs.*, 166 F.3d 930, 935 (7th Cir. 1999). *Palmer* was an ADA case, but the Rehabilitation Act incorporates the standards applicable to Title I of the ADA concerning employment, *see* 29 U.S.C. § 794(d); *Brumfield*, 735 F.3d at 630, and we have applied *Palmer*'s approach to Rehabilitation Act claims. *See Brumfield*, 735 F.3d at 630-31. There is no dispute as to what Felix did and how she behaved during the April 18th incident; and although Felix does not concede that her behavior would have justified her immediate discharge, neither does she contend that the Rehabilitation Act required WisDOT to accept that behavior. *Cf. Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015) ("An essential function of almost every job is the ability to handle stress and interact with others."); *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002)

("An employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position."). In WisDOT's view, she was thus unfit for continued employment.

Rather than moving immediately to fire Felix after April 18, however, WisDOT required that she undergo a professional assessment to determine whether she continued to pose a risk to herself and/or others in her workplace; and in Felix's view, that takes this case out of the *Palmer* qualified-to-work framework and into the direct-threat framework. The direct-threat defense is set forth in the ADA and is among the legal principles that are incorporated into the Rehabilitation Act. *See Branham*, 392 F.3d at 905-06. The ADA explicitly recognizes as a defense to a charge that the plaintiff has been denied employment as a result of qualification standards that "screen out or tend to screen out" individuals with disabilities, the assertion that such standards are "job-related and consistent with business necessity" and that performance of the job cannot be satisfied through a reasonable accommodation. 42 U.S.C. § 12113(a). "Qualification standards" are defined to include a requirement that an individual "shall not pose a direct threat to the health or safety of other individuals in the workplace." § 12113(b).[5] A "direct threat" is in turn defined by regulation to "mean[] a significant risk of substantial harm to the health

---

[5]   The direct-threat defense derives from the Supreme Court's decision in *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 107 S. Ct. 1123 (1987), which, *inter alia*, construed the Rehabilitation Act not to require the hiring of a person who poses a "significant risk of communicating an infectious disease to others." *Bragdon v. Abbott*, 524 U.S. 624, 649, 118 S. Ct. 2196, 2210 (1998) (quoting *Arline*, 480 U.S. at 287 n.16, 107 S. Ct. at 1131 n.16).

or safety of the individual *or* others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r) (emphasis supplied); *see also id.* § 1630.15(b)(2). The regulatory definition thus broadens the concept of direct threat to include individuals who pose a risk of harm to themselves instead of or in addition to others in the workplace. *See Branham*, 392 F.3d at 905-06. The defense requires an individualized assessment, based on reasonable medical judgment, of an employee's present ability to safely perform the essential functions of his job. § 1630.2(r). Among the factors to be considered are:

> (1) The duration of the risk posed by the employee's condition;
>
> (2) The nature and severity of the potential harm that might result;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

*Id.* Because the direct-threat defense is an affirmative defense, it is the employer that bears the burden of proving the defense. *Branham*, 392 F.3d at 906 (collecting cases). Consequently, if WisDOT's motion for summary judgment were grounded in the direct-threat defense, as Felix insists it was, WisDOT would have had to do more than simplify identify evidence supporting the defense; it would have had to demonstrate that the evidence was so one-sided that no reasonable jury could resolve the defense in Felix's favor. *Id.* at 907; *see also, e.g., Hotel*

*71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

The district court, however, did not evaluate WisDOT's summary judgment motion through the lens of the direct-threat framework, and Felix contends that this amounted to legal error. She reasons that whenever an employer has decided to have an employee professionally evaluated to assess what risk, if any, she poses to herself or to her co-workers, the employer is necessarily focusing on the future rather than on anything the employee may have done in the past. In Felix's view, any forward-looking assessment of the risk posed by continued employment of the plaintiff necessarily invokes the direct-threat framework. She points out that WisDOT's own memorandum in support of its request for summary judgment spoke of the risk that WisDOT believed she posed to herself and others, and her counsel surmised from those references that WisDOT necessarily was presenting a direct-threat defense. Not until its reply brief, after Felix had emphasized the substantial burden that the direct-threat defense imposes on the employer, did WisDOT disavow that defense and insist that it was relying on *Palmer*'s qualified-to-work framework instead. This was too late in the day for a switch in legal theory, Felix argues, and effectively deprived her of the opportunity to respond to WisDOT's belated invocation of *Palmer*.

We will give Felix this: There necessarily is some logical overlap between the direct-threat framework and *Palmer*, and by deciding to assess what, if any, danger Felix posed in the wake of the April 18th incident, WisDOT was, in part, making the sort of forward-looking assessment that underlies a direct-

threat affirmative defense. Even so, we do not agree with Felix that WisDOT was pursuing such a defense or that the district court erred in not applying the direct-threat framework to WisDOT's motion for summary judgment.

WisDOT's motion itself did not invoke the direct-threat framework. Its opening memorandum did not cite the defense by name or by reference to its statutory and regulatory provisions. By contrast, the memorandum did reference *Palmer* in support of an argument that after the April 18th incident, Felix was no longer a qualified person with a disability for purposes of her Rehabilitation Act claim. R. 26 at 16-19. Felix nonetheless infers that WisDOT was making a direct-threat type of argument because the memorandum repeatedly referred to Burbach's IME and, in light of the results of that IME, argued that Felix's superiors could legitimately conclude that "Felix was a safety risk to herself and others in the workplace." R. 26 at 17.

The fact that WisDOT chose to have Felix evaluated for ongoing risk rather than making its discharge decision solely on the basis of the April 18th incident did not inevitably place this case within the direct-threat framework. It should go without saying that when a disruptive incident like the April 18th episode has occurred, an employer may seek a professional assessment of the likelihood of an employee's unacceptable behavior recurring before it decides, within the *Palmer* framework, whether the employee is qualified for continued employment. It may be possible, for example, that an employee's behavior is explained by an adverse reaction to a particular medication and can be prevented from recurring by switching to a different medication or dosage. Insisting that an

employer make an *immediate* decision to fire an employee based on his unacceptable conduct in order to invoke *Palmer*—without the benefit of a professional opinion as to whether this likely was a one-time incident or something that was bound to recur—would serve neither employer nor employee. Hasty and reactive employment decisions are the last thing the Rehabilitation Act or the ADA were meant to encourage. Moreover, although WisDOT delayed making a decision until Burbach evaluated Felix, it did not permit Felix to resume her duties while it pondered her fate. She was placed on FMLA leave immediately, and she remained on leave while WisDOT solicited both the IME and information from her own physicians. By Felix's own account, she was unable to work during this period of time. *See* R. 29 ¶ 82. WisDOT's course of action consequently does not undermine the notion that it viewed Felix's behavior during the April 18th episode as potentially disqualifying. By contrast, the employer in *Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513, 526 (7th Cir. 2015), permitted the plaintiff caseworker to continue working with children after the behavior in question occurred, which was wholly inconsistent with the employer's professed concern that the plaintiff's behavior might pose an unacceptable risk to those children.

As a number of courts have recognized, when an employee's disability has actually resulted in conduct that is intolerable in the workplace, the direct-threat defense does not apply: the case is no longer about potential but rather actual dangers that an employee's disability poses to herself and others. *See Mayo*, 795 F.3d at 945; *Sista v. CDC Ixis N.A., Inc.*, 445 F.3d 161, 170-71 (2d Cir. 2006); *Sper v. Judson Care Ctr., Inc.*,

29 F. Supp. 3d 1102, 1112-13 (S.D. Oh. 2014). Put another way, what is at issue once an employee has engaged in threatening behavior is not the employer's qualification standards and selection criteria and whether they tend to screen out people with disabilities, *see* 42 U.S.C. § 12113(a), but whether the employer must tolerate threatening (and unacceptable) behavior because it results from the employee's disability. *Palmer* answers no: the employee is no longer "otherwise qualified" to perform the job. 117 F.3d at 352. The Second Circuit reaches essentially the same conclusion by means of a slightly different route. Once an employee's disability has manifested in threatening conduct, that court views the question as one of disparate treatment: if the employer has terminated a disabled employee because of the danger her conduct poses to herself or others, then the question is simply whether it would have taken the same disciplinary action against a non-disabled employee. *Sista*, 445 F.3d at 171. In other words, the Second Circuit sees the employee's conduct as affecting not whether she is "otherwise qualified" to perform the job, as we did in *Palmer*, but rather whether her employer had a legitimate, non-discriminatory reason to fire her. *Id.* at 171-72. Under either approach, however, the direct-threat defense and its evaluation of prospective dangers no longer has any role to play. As *Sista* explains:

> Under these circumstances, no "individualized assessment," *see* 29 C.F.R. § 1630.2(r) is necessary, because the employee is not being terminated for *posing* a "**direct threat**" as defined by the ADA, but rather for *making* a threat—a legitimate, non-discriminatory reason for

> termination—in accordance with the standard *McDonnell Douglas* analysis. Moreover, rules established by the EEOC make clear that the "poses a direct threat defense" is meant to be applied in cases alleging discriminatory application of qualification standards as opposed to cases in which a plaintiff alleges "disparate treatment," which may be "justified by a legitimate, non-discriminatory reason." 29 C.F.R. § 1630.15(a), (b). Here, Sista does not claim that [the employer's] policies against employee misconduct and threats in the workplace constitute "qualification standards, tests, or criteria" that "screen out or tend to screen out" individuals with disabilities; rather, the gravamen of Sista's claim is that he suffered disparate treatment at the hands of [his employer] when he was fired for being disabled. Accordingly, the "poses a direct threat" defense has no applicability in this case.

445 F.3d at 171 (emphasis in original). Just so here. The dispute in this case is not over qualification standards and selection criteria. No one, including Felix, is affirmatively suggesting that her behavior during the April 18th episode is behavior that WisDOT might have to tolerate lest it inappropriately screen out disabled individuals from its employ. Felix, in the end, is contending based on a variety of factors (including WisDOT's decision to have her undergo a fitness for duty examination rather than discharging her immediately), that WisDOT was not in fact relying on her conduct when it

discharged her but instead was animated solely by her disability. That is a perfectly appropriate and logical theory of the case for Felix to pursue. But as the Second Circuit explained in *Sista*, it presents a straightforward claim of disparate treatment attended by the usual evidentiary burdens. It is not a claim that requires her employer to shoulder the burdens imposed by the direct-threat framework.

Our decision in *Bodenstab v. Cnty. of Cook*, 569 F.3d 651, 658-59 (7th Cir. 2009), concluded that the plaintiff's unacceptable behavior (there, threatening to take the lives of his supervisor and other co-workers if he received bad news on whether his cancer had metastasized) justified his employer's decision to discharge him, wholly apart from its assessment of whether he presented a direct threat to the safety of himself and others in the event he were allowed to return to work. In discharging the plaintiff, the employer had relied on both the threats he had made as well as a psychiatric assessment concluding that his mental condition posed a continuing threat to himself and others. The plaintiff argued that the evidence did not support the latter assessment. We concluded that it was unnecessary to reach that argument, as the threats the plaintiff had already made (or the employer reasonably believed he had made—the plaintiff disputed the details) by themselves warranted his discharge. *Id.*

The same rationale arguably might apply here, given that WisDOT specifically cited the events of April 18 as one of its reasons for discharging Felix, but we need not go that far. We may regard Felix's behavior on April 18 and the IME's conclusion that she continued to pose a risk to herself and others as inextricably intertwined rather than as wholly independent

reasons for WisDOT's decision to discharge Felix. For the reasons we have already discussed, WisDOT may still argue that its decision to discharge Felix was warranted under *Palmer*. And for the reasons that follow, there is no dispute of material fact that WisDOT, consistent with *Palmer*, regarded Felix as unfit for continued employment after April 18.

WisDOT's actions following the April 18th incident are consistent with a genuine concern about the danger that Felix's conduct presented to herself and others. Prior to that episode, WisDOT had accommodated Felix's anxiety disorder by allowing her the time to compose herself in the restroom when she felt an anxiety attack coming on, for example. Never before April 18, however, had Felix's disorder manifested in suicidal gestures or publicly disruptive behavior as it did on April 18. WisDOT immediately placed Felix on medical leave (which is exactly what she herself requested in the aftermath of the incident), directed that she submit to an independent medical examination, asked that she submit information from her own treating professionals, and, after reviewing the IME and the information from Felix's providers, concluded that she continued to present a threat to her own safety and that of others and therefore should be discharged.

The discharge letter itself cites the April 18th incident along with the IME as grounds for the termination decision. In essence, the letter reflects WisDOT's conclusion that, in view of the IME, WisDOT could not be sure that behavior akin to what had occurred on April 18 would not repeat in the future.

Although Felix does not concede that the reasons articulated by WisDOT on their face constitute a legitimate basis for

her discharge under *Palmer*, we are satisfied that they do. Felix's behavior on April 18 suggested that she was a danger to herself: she had attempted to cut her wrists, although the cuts were shallow; she vocally bemoaned the dullness of the knife she had used; and she repeatedly said that she wanted to die. She made these and other remarks in a hysterical state, literally kicking her legs and crying out, and she did so in a public area of the office. Emergency personnel were summoned.

Felix submitted a statement from her psychiatrist indicating that she was fit to return to work as of the date she was discharged; but we do not regard this as sufficient to establish a dispute of fact as to the legitimacy or sincerity of WisDOT's stated reasons for terminating her. Dr. Beld had given conflicting statements as to when Felix could return to work, and beyond asking that Felix be allowed to return to work on July 15, 2013, on a full-time schedule, Beld offered no more than an abbreviated summary of Felix's condition and course of treatment and no real explanation for his conclusion that she was able to return to work, especially given his acknowledgment that her work environment tended to worsen her anxiety- and depression-related conditions. His comments on the form submitted in support of Felix's FMLA leave acknowledged that Felix's current work environment aggravated her condition. Likewise, the other medical records Felix submitted to her employer offered no assessment of her current status and no analysis of why, notwithstanding what had occurred on April 18, Felix could resume her duties. Finally, whatever shortcomings there may have been in Burbach's IME, Felix has cited no evidence suggesting that WisDOT could not and did not credit

his opinion and conclude that Felix remained in danger of repeating the type of behavior that she had exhibited on April 18.[6] The question, after all, is not whether Dr. Burbach's opinion was correct or whether WisDOT was right or wrong to accept his assessment, but whether it did, in fact, rely on his assessment and honestly conclude that Felix's behavior, and the risk of it recurring, warranted her discharge. *See, e.g., Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 338 (7th Cir. 2012).

Felix argues that several facts betray a bias against persons with anxiety disorders, and that a factfinder could thus conclude that WisDOT's decision to fire her was based solely on her disabilities. She argues, for example, that notes from a June 25 meeting between English and Maya Rudd, WisDOT's affirmative action/equal employment opportunity and diversity program officer, reflecting a decision to proceed with a "medical separation … [b]ased on IME comments and recommendations," necessarily indicate that WisDOT was discharging her based on her disability rather than her conduct. In Felix's view, "[c]haracterizing an employee's termination as a 'medical separation' is the definition of terminating an employee because of her disabilities." Felix Reply Br. 3. But "medical" is not a term inherently suggestive of bias or disapproval. And given that *Palmer* and similar cases recognize that an employer may, consistent with the ADA and the

---

[6] Burbach's observation that WisDOT might choose to have Felix undergo a second fitness-for-duty evaluation at a later date does not alter the calculus. Burbach simply noted that as an option, without qualifying his opinion that Felix was not fit for duty as of the date of his evaluation.

Rehabilitation Act, terminate an employee for inappropriate behavior even when that behavior is precipitated by the employee's disability, *see Brumfield*, 735 F.3d at 631, it is by no means surprising nor damning that an employer might refer to the employee's disability or to medical opinion in articulating its reasons for the discharge.[7] Felix also highlight's English's repeated use of the term "risk" when speaking to Beld, and his conclusion that her tone and attitude were redolent of fear and prejudice regarding Felix's condition. (She criticizes the district court itself for using the term "risk.") But we do not think that the use of the term "risk" is problematic; our own cases use that very term and ones similar to it in addressing disability-related conduct that may pose a danger to one's self or one's co-workers. *E.g.*, *Branham*, 392 F.3d at 908 (risk of harm); *Palmer*, 117 F.3d at 352 (jeopardy); *Knapp v. Nw. Univ.*, 101 F.3d 473, 483 (7th Cir. 1996) (risk of injury). And Beld's perception of English's tone and attitude is, on this record, no more than his unsubstantiated opinion. Other than English's use of the term "risk," there is nothing to objectively support the notion that she was acting out of prejudice rather than a legitimate concern for Felix's safety and the safety of others in her workplace. Finally, Felix suggests that WisDOT's purported pursuit and then abandonment of a direct-threat defense represents the sort of shift in rationale for an employer's conduct that would support a finding of pretext. *See Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 677-78 (7th Cir. 2003)

---

[7] The same may be said of WisDOT's reliance upon Wis. Stat. § 230.37(2) in ordering Felix to participate in a fitness-for-duty evaluation and in concluding that, in light of that evaluation, she could not safely, efficiently, and effectively resume her duties. *See* n.2, *supra*.

(collecting cases). But, as we have discussed, WisDOT did not change its rationale. It has consistently represented that Felix's unacceptable behavior on April 18, coupled with the IME's conclusion that she remained at risk of repeating such behavior, rendered her unqualified to remain in her position.

### III.

For all of the reasons we have discussed, we AFFIRM the district court's decision to enter summary judgment against Felix and in favor of WisDOT.