[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13821

_____

D.C. Docket No. 3:17-cv-00137-TCB

JERRI TODD,

Plaintiff - Appellant,

versus

FAYETTE COUNTY SCHOOL DISTRICT,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 27, 2021)

Before ROSENBAUM, LUCK, and ANDERSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

Major depressive disorder affects many Americans—about 7% of U.S. adults

endured at least one major depressive episode in 2017, according to the National

Institute of Mental Health. *Major Depression*, Nat'l Inst. Of Mental Health, https://www.nimh.nih.gov/health/statistics/major-depression.shtml (last updated Feb. 2019). Although major depressive disorder can certainly be debilitating, many have learned to live and even thrive with the condition. Indeed, some believe that President Abraham Lincoln suffered "bouts of depression."[1] Yet he served as one of our country's most able Presidents.

Every day, and in many cases, throughout their entire adult lives, people with major depressive disorder contribute significantly and effectively in their jobs. And oftentimes, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, protects these individuals from adverse employment action taken for reasons relating to their condition.

But even the best among us sometimes have setbacks. And the ADA does not require an employer to retain an employee who it believes behaved in a threatening and dangerous way—even if the employee's major depressive disorder is one reason,

---

[1] Statement by Donna E. Shalala, Sec'y of Health & Human Services, White House Conference on Mental Health, Washington, D.C., Promoting Mental Health for All Americans (June 7, 1999) ("A man known to have suffered bouts of depression once wrote: 'In this sad world of ours, sorrow comes to all, and it often comes with bitter agony. You cannot believe that you will ever feel better. But this is not true. You are sure to be happy again. I have had enough experience to make this statement.' These words belong to Abraham Lincoln."); Joshua Wolf Shenk, *Lincoln's Melancholy: How Depression Challenged a President and Fueled His Greatness*, 23, 240 (First Mariner Books ed. 2005) (awarded the Abraham Lincoln Institute Book Award); Jonathan R.T. Davidson, M.D., Kathryn M. Connor, M.D., & Marvin Swartz, M.D. (Dep't of Psychiatry, Duke Univ. Med. Ctr.), "Mental Illness in U.S. Presidents Between 1776 and 1974", *The Journal of Nervous and Mental Disease*, Vol. 194, No. 1, 47, 49 (identifying a diagnosis for Lincoln of, among other things, "[m]ajor depressive disorder, recurrent") (Jan. 2006).

or the sole reason, that the employee engaged in that behavior. Unfortunately, this case presents that situation.

Plaintiff-Appellant Jerri Todd suffers from major depressive disorder. For many years, she worked without incident as a schoolteacher. But in 2017, when she was speaking with other teachers, Todd allegedly threatened to kill herself and her son (who was a student at the school where Todd taught). She also allegedly made other threats against Defendant-Appellee Fayette County School District ("District") administrators. Given those threats and Todd's alleged over-medication with Xanax while at school, the District did not renew Todd's contract out of concern for student and staff security.

Todd sued the District, claiming discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*; interference with her Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*, rights; and retaliation in violation of all three statutes. In chief, she alleges that, in ending her employment, the District discriminated against her because she suffers from major depressive disorder and retaliated against her for asserting her statutory rights.

Todd now appeals the district court's order granting the District summary judgment. In that order, the district court concluded that the District had terminated Todd's employment because of her conduct—the threats she made against her own

life and the lives of others—not because she had major depressive disorder or because she had participated in statutorily protected activity. After careful review and with the benefit of oral argument, we affirm.

## I.

We begin by reviewing the facts. At the summary-judgment stage, we view the facts and draw all reasonable inferences from them in the light most favorable to the nonmoving party—here, Todd. *Lewis v. City of Union City,* 934 F.3d 1169, 1179 (11th Cir. 2019).

## A.

Whitewater Middle School hired Todd as an art teacher in 2009. That was a difficult year for Todd, whose father had committed suicide the year before, triggering Todd's own suicidal thoughts.

Todd continued to struggle with her father's death and her mental health in the years that followed. She conveyed as much to Whitewater's principal Connie Baldwin, who helped refer Todd to a mental-health professional, Dr. Linda Weigand, and assisted Todd in scheduling her first appointment.

After Dr. Weigand diagnosed Todd with major depressive disorder and anxiety, Principal Baldwin's support for Todd remained steadfast. As Todd tells it, she and Principal Baldwin discussed her mental health, medication, treatment, and related matters many times over the years. Principal Baldwin also agreed to adjust

Todd's work schedule so she could attend appointments with Dr. Weigand in the mornings, before coming to work.

Over the years, Todd also confided in other teachers at Whitewater, including Katy Sweat and Deanise Myers. In particular, Todd recalls discussing her thoughts of suicide with Sweat, who urged Todd not to act on those thoughts because Todd had a son. For a time, that was enough to help Todd through those dark periods.

**B.**

But on Friday, January 20, 2017, things took a turn for the worse. That afternoon, after a minor spat Todd had with the school administration, Sweat recalls Todd saying that "if she had a gun, she and [her son] would not have come back from" winter break.

Todd called Myers later that evening and, according to Myers's testimony, described six ways that she had considered killing herself and her son, including, for example, sedating him with Xanax so that he would not know what was happening when she killed him. Myers also remembers Todd describing her father and her son's father as "f\*\*\*-ups" and saying that she was not going to let her son "grow up to be a f\*\*\*-up" "with bad genes."

That evening, Myers and Sweat discussed Todd's behavior. They were both concerned for the safety of Todd and her son, so they agreed to check in with Todd during the weekend.

5

Todd's behavior spiraled further down when she returned to school the following Monday. When Myers and Sweat visited Todd's classroom for a planning period, Todd again threatened herself and her son.

According to Sweat, Todd shouted that "she had every right to kill her son." Sweat also recalls Todd pointing at her and saying, "All the times you've said that I don't need to kill myself because of my son, well, guess what? He's going with me. I'm taking him with me."

For her part, Myers remembers Todd admitting that she had taken three Xanax pills earlier in the day, and Myers watched her take two more during their conversation. This episode was the tipping point for Myers and Sweat—it was time, they decided, for them to discuss Todd's behavior with the school administration.[2]

Todd, meanwhile, recollects those conversations differently. Concerning her Friday conversation with Sweat about not returning from winter break, Todd recalls saying that she "wished [she and her son] hadn't come back from the beach," "not in the sense that [she] wished [they] were dead, but merely that [she] wished [they] were at the beach." And as for her remarks to Myers that same evening, Todd insists she never said that she would kill her son. Instead, Todd claims it was Myers who said that she "sat at her kitchen table many times with her vodka and orange juice

---

[2] Myers and Sweat had contacted the school's guidance counselors, Natalie Grubbs and Eve Hanie, over the weekend. Hanie reached out to Todd and learned that she had an appointment with her therapist on Monday, so they decided not to contact the school administrators at that time.

6

with a gun on her table contemplating suicide." Todd also denies making specific threats the following Monday. Instead, she asserts that Sweat and Myers badgered her about her mental health.

But even if Todd's memory of those conversations is accurate, Principal Baldwin did not know Todd's version on that Monday afternoon. Rather, Principal Baldwin learned only that Todd had ingested multiple Xanax pills during school, appeared agitated, and threatened to kill herself and her son—who was a student at the school.

Principal Baldwin immediately consulted Officer Lawrence Vazquez, who was employed by the county Sheriff's Department and assigned to Whitewater as the school resource officer. Based on his "knowledge, training, and experience," Officer Vazquez believed Todd's statements presented a "potential danger" and a "definite safety concern." So Officer Vazquez removed Todd from her classroom as a "safety precaution."

Todd denied to Officer Vazquez that she had threatened or planned to kill herself or her son, and she told him that she had an appointment with her therapist that afternoon. Principal Baldwin and Officer Vazquez wanted Todd to attend her appointment but doubted her ability to drive after ingesting Xanax pills. So they arranged for Sweat to drive Todd to her appointment.

After the appointment, Dr. Weigand told Sweat that Todd could return to school.[3] Dr. Weigand later testified that, during that appointment, she believed Todd lacked a plan or intent to kill herself or her son and showed no signs of intoxication. But she also conceded that she was unaware of any reports reflecting Todd's specific threats against herself and her son when she drew those conclusions.[4] And yet, Sweat testified that on the drive back to Whitewater Todd again remarked that "it was her right as a mother to be able to kill her son." Todd denies making this statement.

Todd's alleged statements about killing her son *after* her appointment with Dr. Weigand made Whitewater administrators even more concerned for her son's safety. Upon returning to school, Todd sought to find her son. But Officer Vazquez, who had been communicating with the Department of Family and Child Services ("DFCS") while Todd was at her appointment, intercepted her and took her to his office. Principal Baldwin, among others, convinced Todd to sign a note that allowed

[3] Sweat never told Dr. Weigand about Todd's statements or behavior because she thought one of the school's guidance counselors planned to tell Dr. Weigand. But the guidance counselor was never able to fully inform Dr. Weigand about Todd's behavior.

[4] To be sure, Dr. Weigand testified that she became "aware of a report" that Todd had said something "to the effect of if she would have found a gun over the winter break[,]" she and her son "wouldn't have come back from the beach[.]" In Todd's view, this shows that, during the Monday appointment, Dr. Weigand was aware of reports reflecting Todd's alleged intent or plan to kill herself and her son. But a thorough review of Dr. Weigand's testimony does not support that conclusion. For one thing, Officer Vazquez supplied Dr. Weigand with the reports of Todd's alleged statements in the days *after* Dr. Weigand's appointment with Todd. For another, Dr. Weigand testified that she lacked any knowledge of the statements that Todd allegedly made to Myers and Sweat.

Todd's friend and fellow Whitewater teacher, Amy Cannady, to take her son home with her. Todd was also persuaded to go to Piedmont Fayette Hospital for an evaluation.

The next day, January 24, a psychiatrist at Piedmont asked Dr. Weigand for her permission to involuntarily commit Todd to a mental-health facility. Although Dr. Weigand testified that she thought this step was unnecessary, she still agreed because the process was already in place, and she did not think it would hurt to have Todd evaluated. As a result, Todd was admitted, involuntarily, to Lakeview Behavioral Health until she was released four days later.

## C.

The District did not permit Todd to return to work the following Monday (January 30) because it was still investigating the incident and had not yet received a release from Todd's doctors. That same day, Todd met with the District's Director of Human Resources, Erin Roberson, who oversaw the investigation. According to Roberson, Todd told her that "the statements she made were due to depression and not taking her medications" and "she felt she was talking to co-workers that she could trust." Roberson also reported that Todd admitted having suicidal thoughts but insisted that she never acted on them.

The next day, DFCS sent Roberson a copy of a Safety Plan, which temporarily denied Todd access to her son. But Dr. Weigand and Lakeview Health also sent

letters to Roberson that day, stating that Todd could return to work. Dr. Weigand's letter, in particular, said that Todd was "clear to return to work," and that there was "no concern" that Todd presented a "threat to herself or others" at that time.

Those letters notwithstanding, District Superintendent Dr. Joseph Barrow barred Todd from returning to work while the investigation continued. In Dr. Barrow's view, Todd could not return to the classroom unless the original reports about her behavior proved to be false. Nor did Dr. Barrow want Todd around other students while DFCS prevented her from being around her son. Even so, Dr. Barrow asked Roberson to contact Lakeview to learn whether the District could implement any protocols to prevent Todd from engaging in similar behavior upon returning to work.

Soon after Todd's release from Lakeview, the Clayton County Juvenile Court denied Todd's petition for custody of her son, ordering that he remain with Cannady for the time being. After that hearing, Roberson informed Todd that the District was placing her on administrative leave. In response, Todd claims she told Roberson that she was covered by the ADA.

Roberson followed up a few days later and informed Todd that she could not return to the classroom because she threatened to kill herself and her son and because she was denied custody of her son. She explained to Todd that if Todd did not resign, Dr. Barrow would likely terminate her employment. But Todd refused to resign,

10

instead informing Roberson that she hired an attorney and would be requesting FMLA leave through April 28, 2017. The District granted the FMLA leave Todd sought.

Meanwhile, Todd regained custody over her son on February 28, 2017. A month later, around the end of March 2017, Todd submitted a letter to Roberson from Dr. Weigand, dated March 2, 2017, that said Todd's behavior had stabilized and she had no concern Todd's behavior would recur.

But on March 28, 2017, Roberson received a report that Todd again made threatening comments—this time against other Whitewater employees—to another Whitewater teacher, Julie Lunceford. Lunceford reported that Todd told her that she "lay awake at night trying to thin[k] of the things that [she] can do to people in that building" and that she "just wakes up in the night and just has these ideas." Todd's grin when she said these things scared Lunceford. Todd also asked Lunceford what she thought Principal Baldwin would do if Todd waited by Baldwin's car and tried to speak with her. Based on these remarks, Lunceford was concerned that Todd might act violently towards an administrator. So she stayed with Todd until she saw all three administrators leave.

Todd disputes Lunceford's account. Todd attested that she often spoke with Lunceford after school. According to Todd, on March 28, Lunceford and Todd discussed Todd's appointment with a psychologist. Todd said that she told

11

Lunceford that she "would li[e] awake at night sometimes thinking about conversations I had had with people and what would have been a good comeback to something they had said and things like that." But Todd denied ever making comments about doing things to people, and she said that Lunceford never appeared frightened. Although Todd conceded she had mentioned Principal Baldwin to Lunceford, Todd said she did so only because she felt like she used to be friends with Principal Baldwin and wanted to have a relationship with her again.

Roberson reported to Dr. Barrow all the information she had gathered from her investigation. Based on that information, Dr. Barrow believed (1) that Todd threatened to kill herself and her child first on Friday January 20, 2017, and again "in a more explosive fashion" the following Monday; (2) that Todd consumed "an excessive amount of Xanax pills while at school"; and (3) that Todd made "frightening statements" to Lunceford, including threats against other Whitewater employees, after Dr. Weigand had opined that Todd's behavior would not recur. Because of these beliefs, Dr. Barrow was concerned for "the safety of students and staff in the school," especially because he thought Todd had made threats against Whitewater staff after Dr. Weigand stated that Todd's behavior would not recur. At bottom, Dr. Barrow believed that Todd "could [no longer] effectively work in the District[.]"

12

So on April 26, 2017, Dr. Barrow sent a notice of nonrenewal to Todd. That notice gave Todd twenty days to exercise her right to a formal hearing.[5] Because Todd chose not to contest her nonrenewal and did not request a hearing, her employment ended at the end of the school year.

## D.

Todd filed suit against the District on April 18, 2017, and she filed an amended complaint on July 25, 2018, alleging that the District violated the ADA, Rehabilitation Act, and FMLA. After discovery, the District moved for summary judgment, which Todd opposed. The magistrate judge entered a Report and Recommendation, recommending summary judgment be granted on all claims. Todd objected to the report, but the district court rejected her arguments and adopted the Report and Recommendation.

Todd then filed a timely notice of appeal. On appeal, she contends that the district court erred in granting summary judgment against her on her disability-discrimination claims, her retaliation claims, and her FMLA-interference claim.

---

[5] Roberson had sent Principal Baldwin an email on February 15, 2017, stating that Todd and one other teacher would not be "included on the re-election list." But that email did not represent a final determination. Baldwin testified that there were "different waves of the renewal process," starting with "a big batch, and then there [were] those that [they looked] at a second time and reconsider[ed]." For example, the other teacher named in the February 15 email actually did receive a contract for the 2017-2018 school year.

## II.

We review de novo the district court's order granting summary judgment. *Lewis*, 934 F.3d at 1179.  Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. (quoting Fed. R. Civ. P. 56(a)).  On review, we draw all reasonable inferences in favor of the nonmovant—here, Todd—and we neither weigh the evidence nor make credibility determinations. *Id*.  We may affirm the district court's judgment on any ground that the record supports.[6]  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

## A.

We begin with Todd's disability-discrimination claims under the ADA and Rehabilitation Act.  The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Similarly, the Rehabilitation Act prohibits federally funded

---

[6] The District argues that Todd waived many of her arguments on appeal by failing to properly object to the magistrate judge's report and recommendations.  Title 28, United States Code, Section 636(b)(1)(C) allows parties to file written objections to a magistrate judge's proposed findings and recommendations.  A party that fails to object to a finding or recommendation loses "the right to challenge on appeal the district court's order based on [those] unobjected-to factual and legal conclusions . . . ."  11th Cir. R. 3-1.  Still, we can review unobjected-to errors for plain error. *Id*.  Because we conclude that Todd has not presented enough evidence under even the preserved-error standard of review, she necessarily could not prevail under a plain-error standard.  So we need not address whether she has forfeited any of her arguments.

programs from discriminating against qualified individuals with a disability.  *See Durbrow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1186 n.1 (11th Cir. 2018) (citing 29 U.S.C. § 794(a)).  We analyze claims brought under the ADA and Rehabilitation Act using the same legal framework.  *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997).

To survive the District's motion for summary judgment, Todd must cite evidence that would allow a reasonable jury to find that the District terminated her employment and thus discriminated against her because of her disability (major depressive disorder).  Todd can do this by offering either direct or circumstantial evidence of discrimination.  *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).  Because Todd claims she has presented both direct and circumstantial evidence sufficient to survive summary judgment, we consider both paths.

1. Direct Evidence

In this Circuit, direct evidence is evidence that, "if believed, proves the existence of a fact without inference or presumption." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020) (citation omitted).[7]  "Only the most blatant

---

[7] *Fernandez* is a race-discrimination case, but because we analyze ADA-discrimination claims under the same framework as Title VII and Age Discrimination in Employment Act (ADEA) discrimination claims, we often cite case law under all three statutes interchangeably. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1335 (11th Cir. 1999) (explaining that "because of the similarities between the ADA and ADEA, we often apply the same doctrinal analysis from one statute to another"); *Hillburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims.").

remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id*. (alteration adopted) (citation omitted). By contrast, evidence that merely "suggests, but does not prove, a discriminatory motive" is not direct evidence. *Id*. (internal quotation marks omitted).

In Todd's view, Dr. Barrow's deposition testimony that "the risk of harm arising from [Todd's] mental impairment" was a "primary driver" for the District's decision to fire her is direct evidence of discrimination. This snippet of testimony, Todd argues, shows that the District fired her primarily because she suffered from major depressive disorder, and because it believed that her condition necessarily represented an intolerable risk of harm to others. At its core, this argument invites us to pluck a single line from Dr. Barrow's testimony, to read that line in isolation, and to divorce that line from its context.

But the whole of Dr. Barrow's testimony yields a different conclusion than the one Todd advocates. Before and after making that statement, and again in an affidavit, Dr. Barrow stated that his concerns stemmed from the several threats Todd made against herself and her son. Dr. Barrow also worried about the threats Todd made against school administrators while speaking with Lunceford—threats that Todd made even after Dr. Weigand gave her the green light to return to work. Because of those threats—not because Todd suffered from major depressive

16

disorder—Dr. Barrow concluded that Todd could not be effective in the classroom. Indeed, the record reflects that Dr. Barrow asked Roberson to determine whether the District could maintain protocols that would prevent Todd from engaging in similar behavior upon returning to work.

For these reasons, Dr. Barrow's out-of-context statement is not direct evidence of discrimination, and the district court did not err in reaching that conclusion.

2. Circumstantial evidence

Todd may also rely on circumstantial evidence to survive summary judgment. When a plaintiff seeks to satisfy her burden with circumstantial evidence, we evaluate that evidence under the familiar *McDonnell Douglas*[8] burden-shifting framework that governs Title VII employment-discrimination claims. *Hillburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). Under that framework, Todd must first establish a prima facie case of disability discrimination. To do that, she must show that she (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability. *Lewis*, 934 F.3d at 1179. To prove she has a "disability," a plaintiff must show that she satisfies one of these three circumstances: (1) she suffers from a physical or mental impairment that "substantially limits" at least one of her "major life activities," (2) she has a "record

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

17

of such an impairment," or (3) she has "be[en] regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also Mazzeo v. Color Resols. Intern., LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). As possibly relevant here, "major life activities include . . . sleeping, . . . concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). A plaintiff is a "qualified individual" if she "with or without reasonable accommodation, can perform the essential functions of the employment position that [she] holds or desires." 42 U.S.C. § 12111(8).

If Todd fulfills the prima facie case showing, "the burden of production shifts to [the District] to articulate a legitimate, nondiscriminatory reason for its actions." *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012) (citation omitted).

And if the District satisfies that requirement, the burden shifts back to Todd to show that the reasons the District articulated are merely a pretext for discrimination. *Id*. Ultimately, Todd bears the burden of showing that discrimination was the reason for her dismissal. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). But "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148.

18

### a. Prima Facie Case

Here, the district court assumed Todd established a prima facie case of ADA discrimination, so it focused on the pretext inquiry. But the District argues that Todd cannot even prove a prima facie case because she is not a qualified individual. It urges us to apply *Palmer v. Circuit Court of Cook County*, 117 F.3d 351 (7th Cir. 1997), an out-of-circuit case that, of course, is not binding here. In *Palmer*, the court held that an employee with a mental-health impairment who threatened to kill a co-worker was not a qualified individual under the ADA. *Id*. at 352–53.

We need not determine whether we agree with *Palmer*. Even if we do, *Palmer*'s reasoning is not applicable here. In the *Palmer* line of cases, the employee did not dispute making threats or otherwise participating in disqualifying behavior. *See Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 569 (7th Cir. 2016) (applying *Palmer* in a case when there was "no dispute as to what [the plaintiff] did and how she behaved" during the incident in dispute). By contrast, Todd denies engaging in much of the conduct that led to her termination. So unlike with the employees in the *Palmer* line of cases, we have a genuine dispute here as to whether Todd is a qualified individual under the ADA, a material question that affects Todd's ability to establish a prima facie case of discrimination. For that reason, we will follow the

19

district court's lead and assume for the purpose of this appeal that Todd has made out a prima facie case.[9]

### b. Legitimate, Nondiscriminatory Reason.

Next, the District must come forward with a legitimate, nondiscriminatory reason for not renewing Todd's employment. *See Holland*, 677 F.3d at 1055. The District relies on its determination that Todd could no longer be an effective teacher at Whitewater. Dr. Barrow, the District's decisionmaker, reached this conclusion because he believed, after reviewing Roberson's internal investigation, that Todd (1) threatened to kill herself and her child on both January 20, 2017, and January 23, 2017, in front of Sweat and Myers; (2) took an excessive amount of Xanax while at school on January 23; and (3) threatened during a conversation with Lunceford to harm administrators at Whitewater, even after Dr. Weigand opined that Todd no

---

[9] For the same reason, we need not consider Todd's argument that the District improperly relies on a "direct threat" defense—a defense the District never invoked. The "direct threat" defense allows an employer to fire a disabled employee if the disability "renders the employee a 'direct threat,'" *see Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996) (citing 42 U.SC. §§ 12113(a), (b)), meaning a threat that creates "a significant risk of substantial harm to the health or safety of the individual or others[.]" *See* 29 C.F.R. § 1630.2(r). The "direct threat" defense relates to whether the employee is a qualified individual—prong two of the prima facie case—because it focuses on whether the plaintiff can perform the essential functions of her job. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1280 (11th Cir. 2001) (citations omitted) (explaining that, if a plaintiff cannot establish that "he was not a direct threat," then "he is not a qualified individual and therefore cannot establish a prima facie case of discrimination"); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 222 (2d Cir. 2001) (citations and internal quotations omitted) (noting that the direct-threat "affirmative defense" applies when a "plaintiff is not a qualified individual" "because she poses a direct threat to the health or safety of other individuals in the workplace"). We need not determine whether the "direct threat" defense applies to this case because we assume that Todd established a prima facie case of discrimination.

longer represented a threat to herself or others.  This qualifies as a legitimate, nondiscriminatory reason for Todd's nonrenewal.

We recognize that Todd's behavior, including the threats she allegedly made, likely stemmed from her major depressive disorder.  But that does not mean the District's proffered reasons for declining to renew Todd's contract were discriminatory:  the record does not support the proposition that the District declined to renew Todd's contract because she had been diagnosed with major depressive disorder.  Indeed, Todd noted that she and Principal Baldwin discussed Todd's mental health, medication, treatment, and related matters many times without incident over the years, and that Principal Baldwin, in fact, referred Todd to Dr. Weigand, even scheduling Todd's first appointment.  Instead, the record reflects no genuine dispute that the District ended Todd's employment because it believed she made threats against herself, other employees, and her son, who, again, was a student at the school.

Whatever the cause, the District acted within its rights to eliminate that behavior from Whitewater, especially since Todd's job required that she be responsible for the welfare of her students.  In short, we conclude, as have other courts, that the ADA does not "require that employers countenance dangerous misconduct, even if that misconduct is the result of a disability." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 172–73 (2d Cir. 2006) (concluding that an employee's

21

threatening behavior could serve as a legitimate nondiscriminatory reason for termination even if that behavior occurred because of a mental impairment).

### c. Pretext

Because the District presented a legitimate, nondiscriminatory reason for ending Todd's employment, Todd must show that the District's proffered reason is a mere pretext for discrimination based on her disability. *Alvarez*, 610 F.3d at 1265. To satisfy this burden, Todd points to several pieces of evidence.

First, Todd argues that a genuine dispute of material fact exists on the pretext issue because she denies ever having made threatening statements to Sweat, Myers, or Lunceford. But at the pretext stage of the inquiry, we are unconcerned with the truth of the allegations that led to Todd's termination; "our sole concern is whether unlawful discriminatory animus motivate[d]" the District's decision not to renew Todd's contract. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). As a result, the pretext inquiry "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266; *see also Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1329 (11th Cir. 2020) (citation and internal quotation marks omitted) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all" if the action "is not for a *discriminatory* reason").

22

Taking Todd's argument at face value, it still fails to satisfy the pretext inquiry. It may be true Todd never made the threats that Myers, Sweat, and Lunceford claimed she made. It may also be the case that Todd did not ingest excessive amounts of Xanax during school. But Todd presents no evidence to suggest that Dr. Barrow did not honestly believe that Todd threatened herself, her son, and other employees, or that she ingested excessive amounts of Xanax while responsible for students at school. As a result, the dispute about whether that underlying conduct occurred is not enough for Todd to carry her burden for the pretext inquiry.

Next, Todd argues that Dr. Barrow's true motivation for terminating her employment was his fear that she posed a future risk of harm—a fear that served as a pretext for her major depressive disorder—instead of her past conduct. As evidence, Todd again trots out Dr. Barrow's testimony that "the risk of harm arising from [Todd's] mental impairment" was a "primary driver" in the District's decision not to renew her contract. She also relies on Roberson's notes, which show that Dr. Barrow wanted her to contact Todd's healthcare providers to determine whether the District could develop protocols that would prevent Todd from engaging in similar conduct in the future.

Neither piece of evidence suggests that the District's proffered reasons are pretextual. We start with Dr. Barrow's testimony. As we already explained, Todd

23

brandishes it devoid of context. When viewed in the context of his entire deposition and his affidavit, Dr. Barrow's statement takes on its true meaning: he did not renew Todd's contract because she made threats against herself, her son, and administrators and consumed excessive amounts of Xanax while at school. Based on this behavior, Dr. Barrow explained, he did not think that Todd could be an effective teacher.

Roberson's notes, which reflect Dr. Barrow's desire to implement protocols that would prevent Todd from making suicidal or homicidal threats if she returned to work, also do not show that Dr. Barrow decided not to renew Todd's contract because she suffers from major depressive disorder. Contrary to Todd's view, an employer may investigate "the likelihood of an employee's unacceptable behavior recurring before it decides" to terminate that employee. *See Felix*, 828 F.3d at 570. That the District first sought to find a way for Todd to return to work without endangering the safety of students and staff did not preclude the District from later deciding not to renew her contract because it considered her past misconduct to be disqualifying.

Finally, Todd contends that the letters from Lakeview Health and Dr. Weigand approving her return to work prove that the District's proffered reasons were pretextual. We disagree. Significantly, Todd engaged in some behavior that led to the District's nonrenewal decision *after* Lakeview and Dr. Weigand approved her return to work. As Dr. Barrow explained, he ended Todd's employment, in part,

24

because Todd made threatening statements to Lunceford even "after Dr. Weigand had written a letter stating that there was no concern that Ms. Todd's concerning behavior would occur again."

For these reasons, Todd failed to present sufficient evidence to create a genuine dispute of material fact as to whether the District's proffered reasons for terminating her employment were pretextual.

## B.

Next, we address Todd's retaliation claims under the ADA, Rehabilitation Act, and FMLA. We evaluate retaliatory-discharge claims under all three statutes employing the burden-shifting framework we use to assess retaliation claims in Title VII cases. *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) (FMLA); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (ADA); *Sutton v. Lader*, 185 F.3d 1203, 1207 n.5 (11th Cir. 1999) ("The standard for determining liability under the Rehabilitation Act is the same as that under the ADA.").

To establish a prima face case of retaliation, Todd must show (1) she participated in conduct that the statute protects; (2) she suffered an adverse employment action; and (3) the protected conduct and the adverse employment action are causally related. *Brungart*, 231 F.3d at 798 (FMLA); *see also Farley*, 197 F.3d at 1336 (ADA). Once the employee sets forth a prima facie case, the burden

25

shifts to the employer to offer a legitimate, nondiscriminatory reason for the employment decision. *Farley*, 197 F.3d at 1336. If the employer carries that burden, then the plaintiff bears the ultimate burden to show that the proffered nondiscriminatory reasons "are a pretextual ruse designed to mask retaliation." *Id.* (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)).

Todd argues that she can survive summary judgment on her retaliation claims because of the close temporal proximity between her assertion of her ADA rights, during her February 1 meeting with Roberson, and the District's request that she resign on February 3. She also relies on the closeness in time between when she requested FMLA leave on February 7 and when Roberson emailed Principal Baldwin on February 15 and suggested Todd's contract might not be renewed. We will assume for purposes of our review that Todd has established a prima facie case of retaliation solely through her temporal-proximity evidence.

To meet its production burden, the District once again asserts that it ended Todd's employment for the legitimate business reason that it thought she could no longer be effective in her position based on her threats to herself, her son, and administrators and on her excessive ingestion of Xanax while on duty. That brings us back to Todd, who must show a genuine dispute of material fact concerning the District's stated reason for not renewing Todd's contract.

26

Although Todd's temporal-proximity arguments may be enough to establish a prima facie case of retaliation, temporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020) (en banc) (collecting cases).

Besides the temporal proximity between when Todd asserted her ADA rights and when the District asked Todd to resign, no evidence suggests that the District's stated reasons for ending Todd's employment were merely an excuse to cover up retaliation. To the contrary, the record reflects that the District was already contemplating ending Todd's employment when she asserted her ADA and FMLA rights on February 1 and 7. Although Todd provided the District with a release from Lakeview Health and Dr. Weigand on January 31, Dr. Barrow still refused to let Todd return to work until "the investigation revealed that the initial reports [he] had received were mistaken or untrue." So while the District had not yet decided to end Todd's employment when she asserted her statutory rights, the writing was already on the wall. For that reason, Todd's temporal-proximity argument cannot carry her burden of establishing that the District's proffered reasons for ending Todd's employment were pretext for retaliation. As a result, the district court did not err in granting the District summary judgment on Todd's retaliation claims.

## C.

Finally, we address Todd's FMLA interference claim. The FMLA provides "eligible employee[s]" twelve workweeks of leave during any twelve-month period for a "serious health condition that makes the employee unable to perform the functions of" her job. 29 U.S.C. § 2612(a)(1)(D). An employee who returns from FMLA leave is entitled to be restored to her former position or an equivalent position. *Id.* § 2614(a)(1). The FMLA gives teeth to these provisions by prohibiting employers from interfering with an employee's rights under the Act. *Id.* § 2615(a).

To succeed on her interference claim, Todd must show that she was denied a right to which she was entitled under the FMLA. *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1267 (11th Cir. 2008) (citations omitted). Todd claims the District wrongfully denied her the right to reinstatement under § 2614(a)(1). We disagree.

The right to reinstatement "is not absolute; an employer can deny reinstatement 'if it can demonstrate that it would have discharged the employee had [s]he not been on FMLA leave.'" *Id.* at 1267 (quoting *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001)). And a legitimate reason for ending the employment, "wholly unrelated to the FMLA leave," fulfills that requirement, relieving the employer of its FMLA duty to reinstate an employee whose FMLA leave ends. *Strickland*, 239 F.3d at 1208.

28

This exception to the right to reinstatement applies here.   The District presented evidence that it terminated Todd's employment because she made threats against herself, her son, and other employees and consumed excessive amounts of Xanax while at school.   So the District's evidence supported the notion that it discharged Todd for reasons "wholly unrelated" to her FMLA leave.  *Id*.  As more proof of that, the record also reflects that the District asked for Todd's resignation four days before she took FMLA leave.  And even before asking Todd to resign, the District precluded Todd from returning to work.   In the face of all that evidence, Todd cites nothing from the record to show that the District's decision to end her employment related in any way to her decision to take FMLA leave.[10]

## III.

Millions of Americans, including students and teachers, suffer from mental illnesses. Various statutes, including the ones we consider here, generally protect those Americans from discrimination because of their ailments.  But school districts have a responsibility to keep their students and staff safe from violence.  And when,

---

[10] Todd also argues that she should have been reinstated under 29 C.F.R. § 825.312, a regulation that allows employers to require employees on FMLA leave "to obtain and present certification from the employee's health care provider that the employee is able to resume work." *Id*. § 825.312(a).  If employers have questions about the certification, they can contact the healthcare provider to clarify or authenticate the certification, but they may not prevent the employee from returning to work while they do this. *Id*. § 825.312(b).  But this provision does not apply here because the District is not seeking clarification or authentication for Todd's certification from Dr. Weigand.  Instead, the District terminated Todd because of her behavior (including some that occurred after Dr. Weigand provided Todd with certification).

29

as here, a school district believes that a teacher makes violent threats against herself, her son, and school administrators (and takes improper amounts of medication while responsible for students' welfare), a school district has the right to end that teacher's employment for that reason—even if a mental illness caused or contributed to that behavior. We therefore affirm the district court's grant of summary judgment in the School District's favor.

**AFFIRMED**.