**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-13284

Non-Argument Calendar

————————————

EMILY LAUGHLIN,

*Plaintiff-Appellant,*

*versus*

MIAMI-DADE COUNTY, FLORIDA,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:23-cv-23350-KMM

————————————

Before JILL PRYOR, LAGOA, and WILSON, Circuit Judges.

PER CURIAM:

Appellant Emily Laughlin was a probationary employee of the Animal Services Department (the "ASD") of Appellee Miami-Dade County, Florida (the "County"). During her probationary

period, the County determined that she had failed the terms of her probation and then terminated her employment. Laughlin sued the County after her termination, raising disability discrimination claims under the Americans with Disabilities Act of 1990 (the "ADA"), the Rehabilitation Act of 1973 (the "RA"), and the Florida Civil Rights Act (the "FCRA"). She alleged that she was disabled because of her medical conditions and the County terminated her because of her disability. In response, the County argued that it had a legitimate, nondiscriminatory reason for ending Laughlin's employment, pointing to her poor performance while on probation.

The district court granted summary judgment to the County. After careful consideration, and for the reasons explained below, we affirm the grant of summary judgment.

## I.    BACKGROUND

In the section that follows, we discuss the case's factual background—including Laughlin's probationary employment at the ASD, her medical conditions, and the County's determination that she had failed her probation and its decision to terminate her employment. We then lay out her lawsuit's procedural history.

24-13284                Opinion of the Court                3

### A. Factual Background

In February 2022, Laughlin was hired as an outreach specialist for the Miami-Dade County ASD.[1] Her job duties included booking and hosting pet adoption events at the ASD's animal shelter and in the community. Upon hiring, Laughlin had to successfully complete a 12-month probationary period before attaining civil service status. Probationary employees are informally evaluated by their supervisors rather than through formal performance reviews. Employees who fail probation lose their positions at the ASD.

Several months into her probationary period, Laughlin began to experience health problems. She had migraines, dizzy spells, ringing in her ears, lightheadedness, difficulty swallowing, and episodes of vomiting. The vomiting occurred as frequently as 20 to 30 times per day and made it hard for her to eat. Laughlin's doctor diagnosed her with a brain tumor and masses on her thyroid, as well as an autoimmune disease. After receiving these diagnoses, Laughlin began to seek medical treatment for her medical conditions with specialists, including a neurosurgeon, a neurologist, and a gastroenterologist.

Laughlin discussed her health problems with Gilda Nunez, her supervisor at the time, and a human resources manager. She was asked to provide documentation about her conditions. She

---

[1] Because the district court granted summary judgment against Laughlin, we consider the record in the light most favorable to her. *See Copeland v. Dep't of Corr.*, 97 F.4th 766, 770 n.1 (11th Cir. 2024).

submitted a nurse's note that said she had "multiple complex medical issues" and "require[d] time off to work to complete required testing and follow up." Doc. 20-8 at 1.[2] The ASD gave her an accommodation to work from home on some days and to work flexible hours, provided that she worked eight hours each day.

Although Laughlin had been given permission to work from home, Bronwyn Stanford, the ASD director, was unhappy with this accommodation. Stanford "wasn't a fan of people working from home." Doc. 20-1 at 50–51. She questioned Laughlin about her accommodation, asking, "But how long do you think you're going to be working from home? Is that gonna stop soon? Can we stop that soon?" Doc. 20-2 at 5–6.

Laughlin also had problems with other coworkers once she became sick and started working from home. She reported that they became less responsive to her emails, less responsive to her calls, and less willing to help her with organizing events. One colleague even said that she would respond to Laughlin's calls or emails only if Laughlin was working at the office.

In October 2022, Laughlin helped organize MEGA, the shelter's largest event of the year. While planning the event, Laughlin received no assistance from her coworkers, who gave her "the cold shoulder." Doc. 20-2 at 52. The adoption counselors would not help her decorate. Needing assistance, she asked her mother and mother-in-law to come to the shelter and help out. Shortly before

---

[2] "Doc." numbers refer to the district court's docket entries.

the event, Stanford emailed all ASD staff giving a "SHOUT OUT" to Laughlin for bringing "her mother and aunt here" and doing "an amazing job with decorations." Doc. 28-4 at 2.

In November 2022, Laughlin was assigned a new supervisor, Victoria Valledor, the ASD shelter program manager. Although she allowed Laughlin to work from home, Valledor organized in-person meetings on days when Laughlin was not in the office. Valledor also created an events committee but did not place Laughlin on it, perhaps "in preparation of getting rid of [her]." Doc. 20-1 at 123–24. At one point, Laughlin overheard Valledor telling another colleague "something along th[e] lines" of "you know she's faking it, right? Being sick. There's no way she has a brain tumor." Doc. 20-1 at 130–31.

Laughlin's relationship with her coworkers continued to deteriorate. At "almost every event," members of the ASD staff complained about Laughlin's performance. Doc. 20-5 at 68. According to Valledor, Laughlin would frequently forget to do things at events and then burden other staff to "make up for what she was not doing." *Id.* For one event, Valledor said she had to "scramble last minute" because Laughlin failed to ensure that a mobile animal clinic vehicle was available. *Id.* at 53.

Additional issues regarding Laughlin's performance arose after a December 2022 event. Although Laughlin was not attending the event, she had signed out a portable credit card machine for the use of a counselor who was working the event. When Laughlin was in the office at the end of the next week, she made sure that

the credit card machine had been returned. But the adoption counselor did not return receipts related to the event to ASD's finance division. Instead, the counselor put the receipts in Laughlin's office. Laughlin did not know that the receipts were there, and they were not timely turned in to the finance division. Twelve days after the event, members of the finance division found the receipts on Laughlin's desk. They complained to Valledor, saying that because the receipts had not been turned in, the finance division was "extremely tardy in completing the reconciliation process and submitting documentation." Doc. 20-16 at 2. Laughlin didn't deny that the receipts were overdue. But she said the counselors who worked the events, rather than she, "always handled" the receipts, and that these receipts were put in her office without her knowledge. Doc. 28-1 at 2.

Soon after this incident, Valledor asked Laughlin to meet for an informal discussion about her job performance. Valledor asked the human resources manager to attend as well. At the meeting, Valledor explained that she had been receiving complaints from ASD staff about Laughlin "being unprofessional [and] going into offices and distracting them from work." Doc. 20-5 at 64.

Subsequently, Valledor emailed Laughlin to recap the discussion. She expressed additional concerns with Laughlin's work performance. Among other things, she explained that "several employees ha[d] come to [her] stating they [we]re uncomfortable" with unprofessional statements Laughlin had made. Doc. 20-11 at

2. She also mentioned the concern raised by the finance division about Laughlin's failure to timely submit receipts. *Id.*

According to Valledor, Laughlin's performance did not improve after the meeting. She said that Laughlin continued to be inefficient when working from home. She noted one specific day when Laughlin produced little work output while reporting four hours of work time.

In January 2023, 11 months into Laughlin's 12-month probationary period, Valledor informed human resources that she intended to conclude that Laughlin had failed the probationary period. Human resources then prepared a failure-of-probation letter and presented it to Stanford, who signed it.[3]

Then, Valledor, ASD Assistant Director Annette Jose, and a human resources manager met with Laughlin to tell her that she

---

[3] Stanford's role in the decision to end Laughlin's employment is unclear. In her deposition, Stanford said that she would need to sign a failure-of-probation letter to decide when someone had failed the probationary period. It was her habit to ask questions about the employee's performance before signing. But she did not recall signing Laughlin's failure letter. Yet she acknowledged that she must have signed the letter because her signature was on it. And she did recall being told that Laughlin was "not following through working from home, not responding." Doc. 20-10 at 23. But when asked if she was "involved in the decision to terminate Ms. Laughlin," she replied, "No." *Id.* at 19. When asked who was involved, she replied, "HR" and "maybe" the people "managing" Laughlin. *Id.* Later, in a sworn declaration, she said she "authorized Ms. Laughlin's failure of probation after [she] asked multiple people in her chain of command a series of questions related to her performance." Doc. 20-14 at 1.

had failed her probation. Jose was the assistant director who over-saw human resources. In the meeting, Jose told Laughlin: "unfor-tunately at this time you're not able to dedicate all of your time to the work." Doc. 28-3 at 3. Laughlin replied by asking if she was be-ing "failed because of my health issues." *Id.* Jose replied, "No, be-cause of your performance, but because you're not able to give 100% right now." *Id.* A few minutes later, Jose repeated to Laughlin that the decision "has nothing to do with your -- your health is-sues . . . it has to do with the performance that we need from this position and your inability right now to perform at that level." *Id.* at 4–5.

At the conclusion of the meeting, according to the County, Laughlin voluntarily resigned from her role at the ASD. But Laugh-lin insists that she had been terminated. For purposes of this appeal, we assume that Laughlin was terminated.

## B. Procedural History

Laughlin sued the County, raising, among other claims, dis-ability discrimination claims under the ADA, the RA, and the FCRA.[4] She alleged that the County discriminated against her by terminating her employment due to her medical conditions, which she alleged qualified her as an individual with a disability.

---

[4] Laughlin also raised claims under the Family Medical Leave Act (the "FMLA"). As to these claims, the district court granted summary judgment for the County. On appeal, Laughlin does not challenge the district court's deci-sion regarding her FMLA claims. So, we discuss these claims no further.

The County moved for summary judgment on the disability discrimination claims. It argued, among other things, that based on the evidence Laughlin presented, a reasonable jury could not find that she had a disability. Alternatively, if Laughlin indeed qualified as having a disability, the County argued that she did not establish that it intentionally discriminated against her due to this disability. The County contended that Laughlin's employment had ended for a legitimate, nondiscriminatory reason—her poor performance at work.

The district court granted the County's motion for summary judgment. The court decided that Laughlin failed to establish that she qualified as having a disability. The court also decided that Laughlin failed to establish intentional discrimination with sufficient direct or circumstantial evidence—in large part because she could not show that the County's stated reason for her termination was pretextual. This is Laughlin's appeal.

## II.     STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment, construing the facts and drawing all reasonable inferences in favor of the nonmoving party. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291–92 (11th Cir. 2012). Summary judgment is appropriate if the record gives rise to "no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could

10                    Opinion of the Court                    24-13284

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    DISCUSSION

According to Laughlin, the County unlawfully terminated her due to her disability. She has raised disability discrimination claims under the ADA, the RA, and the FCRA.

The ADA mandates that "no qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any [public] entity." 42 U.S.C. § 12132. A public entity is defined to include "any State or local government" and "any department, agency . . . or other instrumentality" thereof. *Id.* § 12131(1). The RA similarly prohibits discrimination against disabled employees by "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). And the FCRA prohibits discrimination by any qualified employer "against any individual with respect to" their employment "because of such individual's . . . handicap." Fla. Stat. § 760.10(1)(a).

Claims brought under these three statutes are analyzed under the same standards. *See Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1333–34 (11th Cir. 2022) ("In employment discrimination cases, the standards for determining whether an employer violates the Rehabilitation Act shall be the standards applied under [the relevant ADA provisions]."); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) ("[D]isability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims.").

Under all three statutes, to establish that an employer engaged in unlawful discrimination, a plaintiff must show that the employer engaged in intentional discrimination. She "can do this by offering either direct or circumstantial evidence of discrimination." *Todd v. Fayette Cnty. School Dist.*, 998 F.3d 1203, 1214 (11th Cir. 2021).

First, a plaintiff may present direct evidence of discrimination. "In this Circuit, direct evidence is evidence that, if believed, proves the existence of a fact without inference or presumption." *Id.* at 1215 (citation modified).

Second, a plaintiff may establish intentional discrimination through circumstantial evidence. A plaintiff may do so in at least two ways. For one, a plaintiff may satisfy the *McDonnell Douglas* burden-shifting framework. *Todd*, 998 F.3d at 1215; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must make a prima facie case that "she (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability." *Todd*, 998 F.3d at 1215–16. If she makes this prima facie showing, "the burden of production shifts to the [defendant] to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1216. If the defendant satisfies this requirement, the burden returns to the plaintiff to show that the stated reason was "merely a pretext for discrimination." *Id.*

For another, a plaintiff may present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City*, 934 F.3d 1169, 1185

(11th Cir. 2019) (citation modified). "A convincing mosaic may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of similarly situated employees; and (3) that the employer's justification is pretextual." *Id.* (citation modified).

On appeal, Laughlin argues that the district court erred in granting summary judgment for the County. She says that she came forward with direct evidence of discriminatory intent. Alternatively, she asserts that even if there was no direct evidence, she came forward with sufficient circumstantial evidence of discriminatory intent to survive summary judgment under both the *McDonnell Douglas* burden-shifting framework and the convincing mosaic theory.

We disagree. We hold that Laughlin failed to present any direct evidence of discriminatory intent. She also failed to present sufficient circumstantial evidence of discriminatory intent under either the *McDonnell Douglas* framework or the convincing mosaic theory.

We discuss these three issues in turn.[5]

---

[5] We need not decide whether Laughlin qualified as an individual with a disability or whether she suffered an adverse employment action because, even assuming she did, she is unable to show discrimination based on her disability.

### A. Laughlin Failed to Present Direct Evidence of Discriminatory Intent.

First, Laughlin failed to present direct evidence of discriminatory intent. As discussed above, "direct evidence is evidence that, if believed, proves the existence of a fact without inference or presumption." *Todd*, 998 F.3d at 1215. "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* (citation modified). An example of direct evidence would be a manager saying, "Fire Earley—he is too old." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); *see also Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 922 (11th Cir. 2018) (treating the manager's statement that the plaintiff was not hired because the decisionmaker "wanted a Korean in that position" as direct evidence of discrimination).

"By contrast, evidence that merely suggests, but does not prove, a discriminatory motive is not direct evidence." *Todd*, 998 F.3d at 1215 (citation modified). Admittedly, this is a "rigorous standard." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999). "This court has marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998).

For example, in *Wascura v. City of South Miami*, a city clerk raised disability discrimination claims when she was terminated shortly after informing her employer that she needed time off to

care for her sick son. 257 F.3d 1238 (11th Cir. 2001). Her employer said, "I don't want you here. I want you to resign. And if you need an excuse, you can use what's going on at home." *Id.* at 1242 n.2. We explained that this statement did not establish "the existence of discriminatory intent . . . without any inference or presumption." *Id.* (citation modified).

Here, Laughlin argues that she has presented evidence of discriminatory intent by pointing to Jose's statements at the meeting where she learned that her probation had been failed. At the meeting, Jose told Laughlin that the ASD needed "more for this position" than Laughlin was "able to give at this time" and that Laughlin was "not able to give 100% right now." Doc. 28-3 at 3–5. Jose also said she believed it would be "better for [Laughlin] to focus on [herself] and [her] health this—this new year." *Id.* She added that the decision "has nothing to do with your -- your health issues . . . it has to do with the performance that we need from this position and your inability right now to perform at that level." *Id.* at 4–5.

Like the statements by the employer in *Wascura*, Jose's statements do not show "without any inference or presumption" that Laughlin was terminated because of her disability. 257 F.3d at 1242 n.2. Jose's statements are ambiguous and open to interpretation. At most, they "merely suggest[], but do[] not prove, a discriminatory motive." *Todd*, 998 F.3d at 1215 (citation modified). They do not meet our "rigorous standard" for direct evidence of discriminatory

intent. *Damon*, 196 F.3d at 1359. Thus, the district court correctly decided that Laughlin failed to present direct evidence.[6]

### B. Laughlin Failed to Establish Circumstantial Evidence of Discriminatory Intent Under the *McDonnell Douglas* Burden-Shifting Framework.

Second, Laughlin failed to establish circumstantial evidence of discriminatory intent under the *McDonnell Douglas* burden-shifting framework. As discussed above, a plaintiff proceeding under this framework must make a prima-facie case of discrimination. *Todd*, 998 F.3d at 1215–16. If she makes this prima facie showing, the defendant may "articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1216. Then, the burden returns to the plaintiff to show that the stated reason was "merely a pretext for discrimination." *Id.*

We now focus on the pretext issue. "A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1196 (11th Cir. 2024) (citation modified). "The pretext inquiry centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside the decision maker's head." *Id.* (citation modified). Further, an "employer may fire an employee for a good

---

[6] The district court also decided that Jose's statements could not serve as direct evidence of discriminatory intent because she was not the decisionmaker who ultimately authorized Laughlin's failed probation. We need not and do not decide this issue today.

reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id.* at 1195 (citation modified). We do not consider whether the stated reasons are "prudent or fair." *Id.* (citation modified).

Here, even assuming Laughlin made a prima facie case, she failed to demonstrate that the County's stated reason for her probationary failure was pretextual. The County argues, among other things, that ASD staff complained about Laughlin's frequent lack of communication and that the ASD finance division complained about Laughlin's failure to timely submit receipts.

Laughlin failed to show that the County's stated reasons were false. For example, she submitted no evidence indicating that the complaints by ASD staff about her lack of communication were never made. She also points to no evidence that the substance of these complaints was inaccurate. And notably, in a sworn declaration, Laughlin admitted that she did not timely submit receipts to the finance division. Doc. 28-1 at 2–3. Thus, she has not carried her burden to show that the County's stated reasons for failing her probation were "false, and that discrimination was the real reason." *Akridge*, 93 F.4th at 1196.

Laughlin attempts to avoid this result by arguing that some of her poor performance issues were minor mishaps that could not serve as genuine reasons for termination. For example, she observes that ASD counselors usually handled receipt submission on their own. The time she failed to timely submit receipts was her "first time" bearing this responsibility, and there was "zero

indication" that she "was to be terminated over this issue." Appellant's Br. 25. She also notes that Valledor, her supervisor, did not mention the receipt issue in the meetings where her poor performance was discussed. But the problem with Laughlin's argument is that we do not consider whether an employer's stated reasons for dismissal are "prudent or fair." *Akridge*, 93 F.4th at 1195. An employer may fire an employee for any reason, even "a bad reason," so long as it is "not for a discriminatory reason." *Id*. Thus, Laughlin's argument that her performance issues were minor has no merit. Because she could not show that the performance issues cited by the County were pretextual, she has failed to establish a claim under the *McDonnell Douglas* framework.

## C. Laughlin Failed to Establish Circumstantial Evidence of Discriminatory Intent Under the Convincing Mosaic Theory.

Third, Laughlin failed to establish a claim under the convincing mosaic theory. As discussed above, a plaintiff may survive summary judgment by coming forward with "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Lewis*, 934 F.3d at 1185 (citation modified). There are several categories of evidence that may be considered under a convincing mosaic theory. They include "evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of similarly situated employees; and (3)

that the employer's justification is pretextual." *Id.* (citation modified).

The convincing mosaic theory is different but "not more forgiving" than the *McDonnell Douglas* framework. *McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024). Ultimately, both approaches represent two ways to address "the same question: whether the plaintiff has put forward enough evidence for a reasonable jury to conclude that illegal discrimination occurred." *Id.* at 1334.

Here, Laughlin argues that she has presented a convincing mosaic of evidence of discriminatory intent. She first points to Jose's statements at the meeting where she learned that her probation had been failed. As discussed above, Jose said to Laughlin that the ASD needed "more for this position" than Laughlin was "able to give at this time" and that Laughlin was "not able to give 100% right now." Doc. 28-3 at 3–5. Jose added that the decision "has nothing to do with your -- your health issues . . . it has to do with the performance that we need from this position and your inability right now to perform at that level." *Id.* at 4–5.

Laughlin then points to 18 additional statements and actions by her colleagues and superiors. This evidence indicates that some ASD staff members made negative comments about Laughlin, poorly communicated with her, and refused to help her on her tasks, especially after she began working from home sometimes because of her illnesses. For example, Laughlin highlights the incident when Stanford questioned her about her accommodation, asking,

"But how long do you think you're going to be working from home? Is that gonna stop soon? Can we stop that soon?" Doc. 20-2 at 5–6.

Taken as a whole, however, we are not persuaded that Laughlin's evidence can establish a convincing mosaic of intentional discrimination. Instead, her evidence merely indicates that her coworkers were upset and uncooperative with her when she worked from home. Indeed, they believed she performed poorly after she started working from home. ASD staff members complained to Valledor "at almost every event" because Laughlin would forget to do things and then burden other staff to "make up for what she was not doing." Doc. 20–5 at 68. For one event, Valledor had to "scramble last minute" because Laughlin failed to ensure that a vehicle was available. *Id.* at 53. After another event, the finance division complained to Valledor about Laughlin's failure to timely submit receipts. Moreover, Stanford had been told that Laughlin was "not following through working from home, not responding." Doc. 20–10 at 23. Accordingly, Jose explained to Laughlin that the ASD needed "more for this position" than she was able to perform. Doc. 28-3 at 3.

Thus, Laughlin has failed to make a claim with her circumstantial evidence. "[A] reasonable jury," examining Laughlin's mosaic of evidence, could not "conclude that illegal discrimination occurred." *McCreight*, 117 F.4th at 1335.

## IV. CONCLUSION

20                          Opinion of the Court                          24-13284

For the foregoing reasons, we affirm the district court's grant of summary judgment in the County's favor.

**AFFIRMED.**